23-11037

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

MACHELLE JOSEPH,

*Plaintiff-Appellant,*

—v.—

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,
GEORGIA TECH ATHLETIC ASSOCIATION,

*Defendants-Appellees,*

GEORGE P. PETERSON, ET AL.,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

## BRIEF FOR PLAINTIFF-APPELLANT

EDWARD D. BUCKLEY
J. KYLE BROOKS
BUCKLEY BALA WILSON MEW, LLP
600 Peachtree Street NE, Suite 3900
Atlanta, Georgia 30308
(404) 781-1100

LISA J. BANKS
CAROLYN L. WHEELER
COLLEEN E. COVENEY
KATZ BANKS KUMIN LLP
11 Dupont Circle NW, Suite 600
Washington DC 20036
(202) 299-1140

*Counsel for Plaintiff-Appellant Machelle Joseph*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Eleventh Circuit Rule 21.1, the undersigned counsel of record verifies that those persons and entities that have or may have an interest in the outcome of the above captioned case are listed below:

1.    Banks, Lisa J. (counsel for Appellant MaChelle Joseph)

2.    Batten, Sr., Timothy C. (United States District Chief Judge)

3.    Board of Regents of the University System of Georgia (Appellee/Defendant)

4.    Brooks, Joshua Kyle (counsel for Appellant MaChelle Joseph)

5.    Buckley, Edward Daniel (counsel for Appellant MaChelle Joseph)

6.    Calvert, Victoria (U.S. District Court Judge)

7.    Coveney, Colleen E. (counsel for Appellant MaChelle Joseph)

8.    Engel Lewis, Shoshanna (former Defendant)

9.    Faransso, Tania (counsel for Appellee/Defendant Georgia Tech Athletic Association)

10.    Galanek, Christopher (counsel for Appellee/Defendant Georgia Tech Athletic Association)

11.    Georgia Tech Athletic Association (Appellee/Defendant)

12.    Joseph, MaChelle (Appellant/Plaintiff)

13.    Lewis, Marvin (former Defendant)

14.    Machen, Jr., Ronald (counsel for Appellee/Defendant Georgia Tech Athletic Association)

15.    Peterson, George (former Defendant)

16.    Poole, Courtney (counsel for Appellee/Defendant Board of Regents)

17.    Stansbury, Michael Todd (former Defendant)

18.    Stoff, Katherine (counsel for Appellee/Defendant Board of Regents)

19.    Webb, Bryan (counsel for Appellee/Defendant Board of Regents)

20.    Wheeler, Carolyn (counsel for Appellant MaChelle Joseph)

21.    Yood, Benjamin James (counsel for Appellee/Defendant Georgia Tech Athletic Association)

## STATEMENT REGARDING ORAL ARGUMENT

The issues forming the basis of this appeal include complex legal questions and the proper application of summary judgment standards to a dense and complicated factual record. One fundamental legal issue in this case is whether Title VII of the Civil Rights Act of 1964, 20 U.S.C. § 2000(e)(2) *et. seq.* ("Title VII") preempts Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") for purposes of an employment discrimination claim. There is a split among the circuits on this preemption issue and this Court is one of only three circuit courts that has not yet ruled on it. Another critical issue is whether the disparate allocation of resources based on sex constitutes an actionable adverse employment action under Title VII. This is a matter of first impression in this Court. Joseph respectfully suggests that this Court would benefit from an oral argument, which would shed further light upon the issues presented and aid the Court in understanding the complex record and legal issues in the case.

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT............................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ............................ i

TABLE OF AUTHORITIES ................................................... v

STATEMENT OF JURISDICTION ........................................... ix

STATEMENT OF THE ISSUES............................................... 1

STATEMENT OF THE CASE.................................................. 1

   I.   Course of Proceedings and Disposition Below ....................... 1

  II.   Statement of the Facts .................................................. 3

       A.   Joseph was a long-term successful Division I coach ............. 3

       B.   Joseph received fewer resources than the coach of the Men's Basketball Team .............................................. 4

          1.   Facilities ...................................................... 5

          2.   Marketing .................................................... 6

          3.   Staff Salaries ................................................. 8

          4.   Travel ........................................................ 8

       C.   Joseph advocated for equitable resources for WBB .............. 9

       D.   A WBB player complained that Joseph interfered in her personal business ................................................. 14

       E.   Joseph filed a formal internal complaint of discrimination and retaliation...................................................... 16

       F.   Stansbury proposed investigating Joseph......................... 17

       G.   The Littler Investigation and Report............................. 19

PAGE

III. Standard of Review ................................................... 24

SUMMARY OF THE ARGUMENT ........................................... 24

ARGUMENT ................................................................. 25

I.    The court erred in holding that Title VII preempts Joseph's
      Title IX employment discrimination claims ......................... 25

II.   The court erred in granting summary judgment on Joseph's
      Title VII claim of discrimination in the terms and conditions
      of her employment .................................................... 28

      A.   The court erred in holding that the obvious disparity in
           resources did not constitute discrimination in the terms
           and conditions of Joseph's employment.......................... 28

      B.   The court erred in holding these disparities were not based
           on Joseph's sex ................................................... 34

III.  The court erred in granting summary judgment on Joseph's
      retaliatory termination claim on the ground there was no
      triable issue on pretext............................................. 36

      A.   Joseph established a prima facie case............................ 37

      B.   A reasonable jury could find that Defendants' proffered
           reason for terminating Joseph was pretextual................... 38

           1.   A reasonable jury could find that Stansbury decided to
                terminate Joseph before the Littler Investigation
                started and used the Investigation to support that
                decision ...................................................... 38

           2.   The district court abused its discretion when it refused
                to consider the Durham timeline evidence................... 43

           3.   A reasonable jury could conclude that the investigation
                was not independent .......................................... 45

PAGE

    4.  A reasonable jury could find that Stansbury did not
have an honest belief in the findings of the Littler
Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

  C.  A reasonable jury could infer that retaliation was the real
reason for Joseph's termination . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Alexander v. Gardner Denver*,
 415 U.S. 36 (1974) ............................................................... 27

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
 575 U.S. 138 (2015) ............................................................. 30

*Baptiste v. Mann*,
 360 Ga. App. 345 (2021)....................................................... 37

*Barrett v. Whirlpool Corp.*,
 556 F.3d 502 (6th Cir. 2009) ................................................ 35

*Blackman v. City of Opa Locka*,
 No. 10-23985-CIV, 2011 WL 13223512
 (S.D. Fla. Nov. 30, 2011) .................................................... 45

*Calvert v. Doe*,
 648 F. App'x 925 (11th Cir. 2016)................................... 38, 43

*Cleveland v. Home Shopping Network, Inc.*,
 369 F.3d 1189 (11th Cir. 2004) ............................................ 48

*Davis v. Town of Lake Park, Fla.*,
 245 F.3d 1232 (11th Cir. 2001), *overruled on other
 grounds*, *Burlington N. and Santa Fe Ry. Co. v. White*,
 548 U.S. 53 (2006) ....................................................... 30, 31

*Doe v. Dekalb Cnty. Sch. Dist.*,
 145 F.3d 1441 (11th Cir. 1998) ...................................... 31, 33

*Doe v. Gwinnett Cnty. Pub. Schs.*,
 No. 1:18-cv-05278-SCJ, 2019 WL 12336248
 (N.D. Ga. Aug. 22, 2019)...................................................... 37

*Doe v. Mercy Catholic Med. Ctr.*,
 850 F.3d 545 (3d Cir. 2017) ................................................. 26

*Farley v. Nationwide Mut. Ins. Co.*,
 197 F.3d 1322 (11th Cir. 1999) ............................................ 37

PAGE(S)

*Heaton v. The Weitz Co, Inc.*,
  534 F.3d 882 (8th Cir. 2008) .............................................. 46

*Hiatt v. Colo. Seminary*,
  858 F.3d 1307 (10th Cir. 2017) ............................................ 26

*Hively v. Ivy Tech Community College of Indiana*,
  853 F.3d 339 (2017) ...................................................... 36

*Hobgood v. Illinois Gaming Bd.*,
  731 F.3d 635 (7th Cir. 2013) ............................................. 40

*Holcomb v. Iona College*,
  521 F.3d 130 (2d Cir. 2008) .............................................. 35

*Ivan v. Kent State Univ.*,
  No. 94-4090, 92 F.3d 1185, 1996 WL 422496
  (6th Cir. July 26, 1996) ................................................. 26

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ...................................................... 26

*Jefferson v. Sewon America, Inc.*,
  891 F.3d 911 (11th Cir. 2018) ........................................ 24, 51

*Jenkins v. Nell*,
  26 F.4th 1243 (11th Cir. 2022) ........................................... 42

*Johnson v. Ry. Exp. Agency, Inc.*,
  421 U.S. 454 (1975) ...................................................... 27

*Johnson v. Univ. of Cincinnati*,
  215 F.3d 561 (6th Cir. 2000) ............................................. 35

*Kidd v. Mando American Corp.*,
  731 F.3d 1196 (11th Cir. 2013) ........................................... 44

*Lakoski v. James*,
  66 F.3d 751 (5th Cir. 1995) ...................................... 25, 26, 27

*Laxton v. Gap Inc.*,
  333 F.3d 572 (5th Cir. 2003) ............................................. 45

*Lewis v. City of Union City, Georgia*,
  934 F.3d 1169 (11th Cir. 2019) ....................................... 40, 53

PAGE(S)

*Lipsett v. Univ. of Puerto Rico*,
  864 F.2d 881 (1st Cir. 1988) ............................................... 26

*McDonnell Douglas v. Green*,
  411 U.S. 792 (1973) ......................................................... 28

*Moore v. City of Atlanta, Georgia*,
  No. 1:20-CV-3380-JPB-JKL, 2022 WL 19517299
  (N.D. Ga. Dec. 19, 2022), *report and recommendation
  adopted*, No. 1:20-CV-3380-JPB-JKL, 2023 WL 2646300
  (N.D. Ga. Mar. 27, 2023) ................................................... 52

*Morris v. Fordham Univ.*,
  2004 WL 906248 (S.D.N.Y. 2004) ......................................... 35

*N. Haven Bd. of Ed. v. Bell*,
  456 U.S. 512 (1982) ................................................ 25, 27, 31

*Parr v. Woodmen of the World Life Ins. Co.*,
  791 F.2d 888 (11th Cir. 1986) ............................................. 35

*Patterson v. Georgia Pac., LLC*,
  38 F.4th 1336 (11th Cir. 2022) .................................. 37, 38, 51

*Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*,
  510 F.3d 681 (7th Cir. 2007) .............................................. 41

*Preston v. Virginia ex rel. New Review Cmty. Coll.*,
  31 F.3d 203 (4th Cir. 1994) ............................................ 26, 28

*Roberts v. Rayonier, Inc.*,
  135 F. App'x 351 (11th Cir. 2005) ........................................ 48

*Rowell v. BellSouth Corp.*,
  433 F.3d 794 (11th Cir. 2005) ............................................. 44

*Tsavaris v. Savannah Law Sch., LLC*,
  847 F. App'x 634 (11th Cir. 2021) ........................................ 38

*Waid v. Merrill Area Pub. Schs.*,
  91 F.3d 857 (7th Cir. 1996), *abrogated*,
  *Fitzgerald v. Barnstable School Comm.*,
  555 U.S. 246 (2009) ........................................................ 27

PAGE(S)

*Weaver v. Ohio State Univ.*,
   71 F. Supp. 2d 789 (S.D. Ohio 1998),
   *aff'd*, 194 F.3d 1315 (6th Cir. 1999) ..................................... 30

*Wedow v. City of Kansas City, Missouri*,
   442 F.3d 661 (8th Cir. 2006) .............................................. 31

*Williams v. Bd. of Regents of the Univ. Sys. of Ga.*,
   477 F.3d 1282 (11th Cir. 2007) ........................................... 24

*Woodard v. Fanboy, L.L.C.*,
   298 F.3d 1261 (11th Cir. 2002) ........................................... 47

*Zarda v. Altitude Express, Inc.*,
   883 F.3d 100 (2d Cir. 2018), *aff'd*,
   *Bostock v. Clayton Cty, Georgia*,
   140 S. Ct. 1731 (2020) .................................................... 36

## Statutes

28 C.F.R. § 42.604 ......................................................... 28

20 U.S.C. § 1681(1) ........................................................ 35

20 U.S.C. § 1681(a) ........................................................ 28

42 U.S.C. § 1981 ........................................................... 27

42 U.S.C. § 1983 ........................................................... 2

42 U.S.C. § 2000e-2(a)(1) .................................................. 28

O.C.G.A. § 13-6-11 ......................................................... 2

O.C.G.A. § 45-1-4, Georgia Whistleblower Act .......................... 1, 37

O.C.G.A. § 50-18-17, Georgia Open Records Act ......................... 1, 2

Title VII ............................................................... *passim*

Title IX ................................................................ *passim*

## Other Authorities

U.S. Const., Amend XIV ..................................................... 2

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States. Doc. 1, ¶ 5. This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal of a final judgment of the United States District Court for the Northern District of Georgia that disposed of all of the parties' claims. Plaintiff-Appellant timely appealed from the district court's March 3, 2023, Order granting Appellees' Motions for Summary Judgment [Doc. 273] and Judgment [Doc. 274] by filing a Notice of Appeal on March 31, 2023 [Doc. 275].

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in holding that Title VII preempted Joseph's sex discrimination in employment claims brought under Title IX.

2.      Whether the district court erred as a matter of law in granting summary judgment for the Board of Regents of the University System of Georgia ("BOR") and the Georgia Tech Athletic Association ("GTAA"), collectively the "Defendants", on Joseph's Title VII claim of sex discrimination in the terms and conditions of employment based on disparate allocation of resources.

3.      Whether the district court erred in concluding that there was no issue of material fact as to the reasons given for Joseph's termination and granting summary judgment for the Defendants on Joseph's retaliatory termination claims under Title VII, Title IX and the Georgia Whistleblower Act.

## STATEMENT OF THE CASE

### I.    Course of Proceedings and Disposition Below

Appellant MaChelle Joseph ("Joseph") filed a civil action against BOR, GTAA, George Peterson, Todd Stansbury, Marvin Lewis, and Shoshanna Engel in the Superior Court of Fulton County, Georgia.   Civil Action No. 2019-CV-331019; Doc. 1-2. Joseph asserted claims of sex-based discrimination and retaliation in violation of Title VII, Title IX and the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 ("GWA") against BOR and GTAA; a breach of contract claim against BOR and GTAA; a claim BOR violated the Georgia Open Records Act, O.C.G.A. § 50-18-17; claims against the

individual defendants for sex discrimination in violation of the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. § 1983 ("Section 1983"); and a claim for litigation expenses under O.C.G.A. § 13-6-11 against all Defendants. *Id.* at 44-69.

Defendants removed the case to the U.S. District Court for the Northern District of Georgia, Doc. 1, and filed separate partial motions to dismiss. Docs. 3, 4, and 6. BOR also moved to dismiss the Georgia Open Records Act claim. Doc. 29. Joseph filed responses to these motions, Docs. 16 and 40, and Defendants replied. Docs. 19, 20, 22, 45. On May 8, 2020, the district court dismissed the Title IX sex discrimination and associational discrimination claims against BOR and GTAA, the Section 1983 claims against the individual defendants, the GWA retaliation claim against GTAA, and the breach of contract claim against BOR. Doc. 64

After discovery on the remaining claims, Joseph and BOR filed cross-motions for sanctions for spoliation of evidence. Docs. 168, 171. The district court denied Joseph's motion for sanctions and granted BOR's motion for sanctions, ordering that Defendants could present evidence of alleged spoliation to a jury which would determine whether spoliation occurred. Docs. 203-204. BOR and GTAA filed separate motions for summary judgment, Docs. 212, 214, Joseph responded, Docs. 219, 220, and BOR moved to supplement its statement of material facts. Doc. 225. The district court granted BOR's motion and allowed Joseph to file a supplemental brief in response. Doc. 227.

BOR and GTAA filed replies to Joseph's responses to their respective motions for summary judgment, and BOR filed a separate notice of objections. Docs. 228, 229, 230, 231, 232. Joseph filed her supplemental brief to address BOR's supplemental facts, Doc. 236, and subsequently filed her response to BOR's notice of objections, Doc. 240, and sought leave to amend three sentences in her response to BOR's motion for summary judgment and a paragraph of her statement of additional material facts to which BOR objected. Doc. 241. Joseph filed a motion for reconsideration of the district court's sanctions orders, arguing that she had recently learned the then-presiding judge had a conflict of interest which might have influenced those orders. Doc. 265.

On March 3, 2023, the district court granted Joseph's motion for leave to amend, denied Joseph's motion for reconsideration, granted Defendants' motions for summary judgment, Doc. 273, and entered judgment for Defendants, Doc. 274. On March 31, 2023, Joseph timely filed her notice of appeal. Doc. 275.

## II. Statement of the Facts

### A. Joseph was a long-term successful Division I coach.

Coach MaChelle Joseph ("Joseph") was the Head Women's Basketball ("WBB") Coach at Georgia Tech ("GT") from 2003 until her termination on March 26, 2019. Doc. 175 at 15:15-17.[1] Joseph was regarded as a tough but caring coach

---

[1] Citations to deposition transcripts are to the page and line number assigned by the court reporter.

3

who challenged her players with the intensity of language and emotion common in Division I athletics.  Doc. 173 at 82:4-13; Doc. 174 at 235:10-237:1; Doc. 192 at 13:4-16:1, 61:21-62:25, 72:6-75:21; Doc. 182 at 21:3-23:21; Doc. 220-68; Doc. 220-29 at 1.  She had a long and successful career at GT – at the time of her termination, she was the winningest coach in the history of GT WBB.  Doc. 220-4 at 4 ¶ 26.

**B. Joseph received fewer resources than the coach of the Men's Basketball Team.**

While Joseph achieved much success as a coach, Defendants made her job more onerous by refusing to provide her resources equal to those of the coach of the GT Men's Basketball ("MBB") program.  As head coach, Joseph was responsible for administering the WBB program.  Doc. 182-7 at 2-4.  This entailed, *inter alia,* coaching, recruitment, hiring and managing assistant coaches, and marketing.  *Id.* The head coach of the MBB program had virtually the same job duties as Joseph.  Doc. 211-2 at 4-5; Doc. 220-2 at 3 ¶ 7 (Chart A).

Resources provided by GT for facilities, marketing, staffing, and travel are critical for a coach to perform her job as coach.  Doc. 220-4 at 5-17 ¶ 29, 31, 32, 76; Doc. 211 at 58:16-59:25, 86:23-88:5, 92:14-23, 96:25-97:15, 105:10-106:11.  These resources assist coaches in recruiting, coaching, and ultimately winning games.  *Id.* During her tenure, GT provided Joseph with far fewer resources than the coaches of the MBB team.

### 1. Facilities

The locker room and office space that GT provided to Joseph and the WBB team was far inferior to the locker room and office space that GT provided to the male coaches of the MBB team.  Doc. 220-4 at 10-16 ¶ 49-63, 74; Doc. 174 at 239:18-240:11; Doc. 192 at 88:3-90:15; Doc. 182 at 102:8-103:21.

The MBB locker room, which had been consistently upgraded, had several connected spaces; newer lockers; a nutrition room; a lounge with game tables, TV, gaming system, and armchairs; a recovery room; a training room; and a laundry room with several washers and dryers and individual laundry lockers.  Doc. 211 at 61:5-65:2, 68:5-6; Doc. 220-4 at 12 ¶ 58-60.  The WBB locker room, which had not been significantly upgraded, had far less space; old and broken lockers; one multi-purpose room; shared shower facilities for male and female coaches; and a laundry room the size of a closet with one washer and dryer and a communal laundry bin.  Doc. 220-4 at 10-12 ¶ 50-57.  In addition, the MBB locker rooms were also more accessible to the Zelnak practice facilities than the WBB locker rooms.  Doc. 220-4 at 13 ¶ 62-63.

The MBB coaching staff also had its own office space in one wing of the building that afforded individual offices for the head coach and three assistant coaches and a separate conference room.  Doc. 211 at 76:15-77:20. The WBB staff shared office space with the swim team staff in the same building.  Doc. 220-4 at 14

¶ 65.  Some GT WBB assistant coaches had to sit at desks in the hallway while two staff members shared an office.  *Id.*

GT's failure to provide Joseph a locker room and office space of similar quality and accessibility to the MBB locker room required her to devote substantial time to fundraise for basic improvements.  Doc. 212-5, Int. No. 3 at 10-11; Int. No. 2 at 2-3 (inc. No. 3); Int. No. 5 at 27-28 (inc. No. 3); Doc. 175 at 195:15-22.  It created impediments for her and the WBB team on game days and the impression that MBB was more valued than WBB, Doc. 212-5, Int. No. 3 at 10-11; Int. No. 2 at 2-3 (inc. No. 3); Int. No. 5 at 27-28 (inc. No. 3); Doc. 175 at 129:12-131:11, 172:6-173:16.  And it hampered Joseph's ability to recruit, which is critical for a basketball program.  *Id.*

### 2.  Marketing

GT provided Joseph and the WBB program far less money and fewer resources for marketing than it provided the MBB program.  Doc. 193 at 196:7-10, 198:25-199:5; Doc. 2 ¶ 72.  During the final decade of Joseph's employment, her annual marketing budget was approximately $22,000.  Doc 212-5, Int. No. 3 at 11-12; Int. No. 2 at 2-3 (inc. No. 3); Int. No. 5 at 27-29 (inc. No. 3).  This budget did not include any funds to finance external advertisements such as articles, off-campus billboards, radio, or digital marketing.  *Id;* Doc. 182-12 at 5-6.  Without sufficient funds, Joseph was also unable to hire a full-time dedicated marketing professional

for WBB, which forced her to devote other resources to this function, either by marketing the team herself or allocating a portion of her fundraising or assistant coach salary budget to hire part-time help. *Id*.

By contrast, the coaches of the MBB program had sufficient funds for external advertising and a dedicated full-time marketing professional. Pursuant to GT's employment contract with the then MBB head coach, Josh Pastner, GTAA paid to produce television and radio shows for Pastner during the MBB season, and paid him an additional $600,000-$800,000 in 2016-2019, respectively, to participate. Doc. 211-2 at 6-7. In addition, GT provided a full-time marketing professional to MBB and used an outside group to sell GT MBB home game tickets but not for GT WBB. Doc. 193 at 197:19-198:24; Doc. 220-4 at 20 ¶ 93.

GT's failure to provide Joseph and the WBB team comparable funding and support for marketing impeded her ability to market and promote the WBB team. Doc 212-5, Int. No. 3 at 11-14; Int. No. 2 at 2-3 (inc. No. 3); Int. No. 5 at 27-29 (inc. No. 3). It required her to devote time she could have spent on coaching and recruiting to finding opportunities to market the WBB and forced her to divert fundraising and staff salary funds to marketing. *Id; see also* Doc. 175 at 107:14-108:16, 129:12-133:2, 139:6-140:10, 144:7-20; Doc. 182-12 at 5-6.

### 3. Staff Salaries

GT provided Joseph less money to hire assistant coaches for the WBB team than it provided to the head coach of the MBB team to hire assistant coaches. Doc. 220-17 at 30-31; Doc. 220-18 at 32-33; Doc. 220-19 at 38-39; Doc. 220-20 at 39-40; Doc. 220-21 at 40-41. Joseph had to augment her assistant coach salary pool through fundraising, which created extra work. Doc. 175 at 146:13-19, 177:6-178:4; Doc. 220-4 at 39 ¶ 167; Doc 212-6, Supp. Resp. to Int. No. 5 at 7. During Joseph's employment with GT, Pastner never had to do any fundraising to afford a coach or staff member. Doc. 211 at 93:9-12. Joseph's smaller salary pool also undermined her ability to recruit and retain qualified assistant coaches. Doc 212-5, Int. No. 3 at 14; Int. No. 2 at 2-3 (inc. No. 3); Int. No. 5 at 27-29 (inc. No. 3); Doc. 175 at 99:2-17, 177:6-178:4.

### 4. Travel

GT provided Joseph and WBB less money for travel than it provided MBB. Doc. 220-17 at 36; Doc. 220-18 at 37; Doc. 220-19 at 45; Doc. 220-20 at 46; Doc. 220-21 at 47. GT's failure to provide Joseph and WBB a similar travel budget relative to the MBB team interfered with Joseph's ability to develop and administer the WBB program, as it often resulted in student-athlete welfare issues, such as fatigue, missed classes, and less time for game preparation, impacted game performance, made recruiting more difficult, and led recruits to question the school's

commitment to the team's success within the ACC and nationally.  Doc. 212-5, Int. No. 3 at 14-15; Int. No. 2 at 2-3 (inc. No. 3); Int. No. 5 at 27-29 (inc. No. 3).

### C.  Joseph advocated for equitable resources for WBB.

Joseph first learned that differences existed between the funding and resources being allocated to her and WBB relative to MBB in the 2006-07 school year through her participation in GT's 10-year NCAA certification review.  Doc. 220-4 at 7-8 ¶ 36-41.  After learning of these disparities, Joseph raised concerns with GT's then Title IX Coordinator for Athletics, Theresa Wenzel.  Doc. 174 at 238:12-241:9; Doc. 173 at 106:13-107:8, 151:1-9.  Wenzel assured Joseph that she was working to address the issues and told her GT was making progress toward improving these disparities.  Doc. 220-4 at 30 ¶ 128-130, 132-133.

Joseph's concerns about resource disparities deepened, however, in 2016 when Wenzel left GT.  Doc. 220-4 at 39 ¶ 164.  At that time, the state of the WBB locker room remained the same as it had been since the beginning of Joseph's tenure, as did the WBB marketing budget.  Doc. 220-4 at 16-17 ¶ 72, 77.  In addition, the new Athletic Director of Finance, Marvin Lewis, proposed decreasing the WBB assistant coach salary pool in 2016 by $13,000.  *Id.* at 39 ¶ 166.  That same season, GT increased Pastner's assistant coach salary budget by $190,000.  Doc. 7 ¶ 117. Lewis also became the Sport Administrator for MBB and entered into a romantic relationship with Shoshanna Engel, the new Title IX Coordinator.  Doc. 193 at 22:17-25, 44:14-45:1; Doc. 210 at 18:7-24.

9

Despite the change in Athletic Department leadership, Joseph continued to raise concerns about the gender-based discrepancy in resources between MBB and WBB throughout 2016 with the new WBB sport administrator, Joeleen Akin. Doc. 220-4 at 41-42, 45 ¶ 175, 176, 177, 179, 190, 197; Doc. 220-7; Doc. 220-8; Doc. 220-10; Doc. 183 at 32:11-34:1, 36:18-37:14. Akin informed the Athletic Director, Todd Stansbury, who began in or around November 2016, of Joseph's concerns regarding funding and resources. Doc. 182 at 31:20-25; Doc. 183 at 50:18-51:17. By Spring of 2017, Joseph's relationship with Akin was strained. Doc. 220-4 at 48 ¶ 200.

At the same time, Stansbury replaced Akin with Mark Rountree as WBB Sports Administrator. Doc. 182 at 72:1-75:16. Joseph raised concerns with Rountree about the allocation of resources between WBB and MBB throughout 2017. Doc. 220-4 at 48 ¶ 203, 204; Doc. 192 at 87:18-88:2, 88:3-89:13, 122:4-124:22; Doc. 220-27. Joseph expressly told Rountree and Stansbury that she believed the difference between the men's and women's locker rooms created Title IX concerns. Doc. 182 at 102:22-103:1; Doc. 220-4 at 14 ¶ 69. Stansbury told Lynn Durham, the Chief of Staff to the GT President, that Joseph had expressed concerns about Title IX, including regarding the money for travel and salaries. Doc. 181 at 33:8-34:5, 44:15-24, 45:15-22.

Because GT took no action to upgrade the WBB locker room, Joseph spent many months in 2017-2018 fundraising for the upgrade. Doc. 175 at 195:15-22, 197:5-19. She helped raise $2.64 million, virtually all the money needed. Doc. 182-

10

10 at 2.  The time spent fundraising for the WBB locker room upgrade stole time away from her core coaching duties.  Doc. 175 at 195:15-22, 197:5-19.  Pastner did not fundraise for any improvements to the MBB locker room; Stansbury himself solicited money for upgrades to the MBB locker room.  Doc. 192-5 at 2; Doc. 192 at 104:10-107:11.  Despite Joseph's successful fundraising efforts, the WBB locker room upgrades were not made during Joseph's tenure.  Doc. 220-4 at 16 ¶ 72.

Throughout 2018, Joseph continued to raise concerns with Athletic Department leadership about the fact that she had fewer resources than her male counterpart.  Doc. 220-4 at 21, 57-58 ¶ 95, 237- 239- 241; Doc. 192 at 128:6-130:3, 135:2-6, 156:3-164:7; Doc. 182-11 at 39-44; Doc. 182-12.  She also complained to Akin, Rountree, and Stansbury that it was difficult to challenge Lewis's budget decisions as a Title IX violation when he was in a romantic relationship with Engel, the Title IX Coordinator.  Doc. 220-4 at 61 ¶ 254-255.

Over time, Joseph's advocacy was met with increasing hostility.  In the Spring of 2018, Rountree refused to commit to a guaranteed contract extension for Joseph, telling Joseph's agent, Garry Rosenfield, that Stansbury first wanted her to make it to the NCAA tournament to get an extension.  Doc. 220-4 at 54 ¶ 223-24.  Rosenfield responded that Stansbury was holding Joseph to a different standard than Pastner.  Doc. 192 at 226:12-230:12.  Rosenfield asked for a meeting with Stansbury; Rountree said he was not available until June.  Doc. 220-4 at 54-55 ¶ 228.

Meanwhile, on June 20, 2018, Joseph's assistant head coach, Rob Norris, resigned, claiming in his resignation email that the WBB program was "targeted by various departments" and that it "did not get the attention it deserved, which made the job more difficult and less full-filling(sic)."  Doc. 218-3 at 5.  Around that time, Joseph spoke with Akin and Rountree about her continued concerns about the conflict of interest created by Lewis's and Engel's relationship.  Doc. 220-4 at 61 ¶ 254.  When no action was taken, Joseph met with Stansbury and Rountree in July 2018, and stated that other female coaches had voiced similar concerns about Lewis's budgetary decisions for women's athletics and their inability to address it with Engel.  Doc. 220-4 at 62 ¶ 255-56.  Stansbury became emotional, annoyed, and/or angry.  Doc. 192 at 138:23-139:14, 146:24-150:15; Doc. 182 at 117:6-118:9; Doc. 220-4 at 62 ¶ 257. Stansbury responded that maybe those female coaches should all be fired, or words to that effect.  Doc. 220-4 at 62-63 ¶ 257-258.

On September 14, 2018, Rosenfield finally spoke with Stansbury about Joseph's contract extension.  Doc. 220-29.  At this time, Stansbury shifted the reason for the delay in extending Joseph's contract from the NCAA tournament to an on-going NCAA investigation into the WBB program.[2]  *Id.*

---

[2] On May 1, 2018, Engel informed Joseph that the NCAA had asked her to conduct an internal inquiry into the WBB program relating to an allegation that a WBB staff member had paid for a recruit.  Doc. 220-4 at 55 ¶ 230

As the 2018-2019 season began in November 2018, Joseph felt unsupported and subjected to increasing hostility. Doc. 220-4 at 68-69 ¶ 279, 281-282. Stansbury stalled the WBB locker room project to wait for MBB, even though Joseph had raised over $2 million for the project. *Id.* ¶ 279. Her marketing budget had remained the same throughout her tenure as coach, despite repeated requests to improve it. *Id.* at 17 ¶ 77. She had recently lost an assistant coach, who appeared to leave in part because of the lack of support GT provided WBB. Doc. 218-3 at 5. Joseph also felt hostility from Engel, whose relationship with Lewis she had openly characterized as a conflict of interest. Doc. 220-4 at 69 ¶ 282. And, finally, Stansbury and Rountree were giving Joseph the run-around on her employment contract. Doc. 220-4 at 69 ¶ 281.

Seeking relief from the discrimination and retaliation she felt she was facing, on November 21, 2018, Joseph sent a letter through counsel to GT President Bud Peterson, copying Stansbury and Rountree. complaining of retaliation by members of Athletic Department leadership for her complaints of disparate allocation of resources and differential treatment of her as a female coach. Doc. 220-4 at 69 ¶ 283; Doc. 182-18. She also expressed concern that her contract negotiations had stalled because of those complaints. *Id.* Peterson understood the letter as raising potential Title IX and retaliation concerns. Doc. 187 at 122:19-124:14, 125:16-23. Peterson and Stansbury read the letter and met shortly thereafter to discuss it. Doc. 220-13 at 12.

Joseph met with Rountree on December 12, 2018, to discuss her November 21 letter. Docs. 220-32, 220-33. Joseph expressed concerns about Lewis and Engel, as well as her belief that her contract was being held up because of her complaining about the resources being given to her program relative to MBB. Doc. 220-4 at 69 ¶ 286. Rountree responded that he did not believe that GT had Title IX issues, but that even if it did, it was not like anyone would "die" – GT would just be told to get into compliance. *Id*. Rountree asked Joseph to write up the concerns she had expressed during the meeting and send them to him. Doc. 220-4 at 70 ¶ 287

At this point, by the end of 2018, Athletic Department officials had tired of Joseph's advocacy for gender equity. Lynn Durham, Peterson's Chief of Staff and liaison to the Athletic Director, agreed that it would be fair to characterize Joseph as a "relentless advocate for gender equity," Doc. 181 at 189:2-9, and opined that Stansbury, with whom she spoke weekly, appeared to be "worn down" and at times "annoyed" by Joseph's advocacy for WBB. *Id.* at 19:25-20:8, 23:15-21, 28:1-25, 33:8-34:5, 44:15-50:15, 187:21-189:21; Doc. 182 at 39:6-40:2.

### D. A WBB player complained that Joseph interfered in her personal business.

In January 2019, players on the WBB team accused teammate Francesca Pan of being negative and bringing people down. Doc. 180 at 104:10-105:20, 108:12-109:9; Doc. 185 at 131:15-25. Another WBB player, Kierra Fletcher, told Pan that she wanted to step back from their relationship, which upset Pan. Doc. 180 at

14

108:12-109:9. When Joseph learned of the conflict between Pan and her team members, she tried to facilitate a solution. *Id.* at 108:12-113:2.

On January 25, Fletcher told WBB Player Personnel Administrator Felicia Tucker that she was worried about Pan's mental health. Doc. 180 at 124:1-11. Tucker instructed Pan to meet with her the next day and to bring any other players who wanted to join. Doc. 180 at 125:21-127:4. On January 26, Pan and Fletcher and two other players met with Tucker and Aisha Oliver-Staley, Vice President for Compliance, Ethics, and Legal Affairs. Doc. 180 at 129:6-11. The players spoke on behalf of themselves, not on behalf of their teammates. *Id.* at 129:6-130:9. The players complained about Joseph being in their personal business. Doc. 185 at 306:24-309:7. Oliver-Staley told the players that what they had reported "wasn't enough" and instructed them to have their parents write a letter. Doc. 184 at 189:7-22; 67:16-21.

Sometime after this January 26 meeting, Oliver-Staley told Stansbury that some student-athletes had met with her about Joseph. Doc. 182 at 156:13-157:11, 157:12-20. She did not indicate specifically what the student-athletes had shared with her. *Id.* On February 8, 2023, Oliver-Staley left the country on vacation. Doc. 180-9 at 9; Doc. 179 at 157:1-12.

Around this same time, Rountree told Stansbury he was resigning as WBB sport administrator because of the volume of communications from Joseph. Doc.

182-2 at 72-73; Doc. 182 at 161:12-162:2.  Stansbury responded cryptically to Rountree not to resign because he had been "working on something w[ith] regard to this" and he may have a "path forward."  Doc. 182-2 at 72-73.

### E. Joseph filed a formal internal complaint of discrimination and retaliation.

On Friday February 8, 2019, Joseph filed a formal internal complaint of discrimination and retaliation.  Doc. 182-22.  She submitted the complaint to Rountree, copying Stansbury and others.  *Id.*  In her complaint, Joseph raised concerns about the disparate allocation of resources to her and WBB and retaliation she had faced after complaining about these inequities and asserted that Stansbury and Akin had been complicit in or carried out the retaliation against her.  *Id.*

That same day, Engel and Stansbury learned that the NCAA would not be moving forward with any charges against Joseph and the WBB program.  Doc. 220-4 at 72 ¶ 296.  Not only did Stansbury not inform Joseph about this long-awaited result, but he also did not begin contract negotiations with her agent, as he had said he would do once the NCAA investigation was completed.  *Id.*

On February 11, 2019, between 11:00 a.m. and 12:00 p.m., Durham left Stansbury a letter referring to "Francesca."  Doc. 182-2 at 33-34; Doc. 181 at 106:18-108:25. The letter was not signed or dated.  Doc. 182-24. Stansbury understood the letter to allege only that the environment was "unhealthy" because Joseph and her staff had claimed that "Francesca" was "negative," that the team was playing badly

16

because of her, and her best friend, and teammates should stay away from her.  Doc. 182 at 197:11-199:25.  Stansbury did not speak to Joseph about the allegations in the letter.  Doc. 220-4 at 76 ¶ 311.

### F. Stansbury proposed investigating Joseph.

Within an hour of receiving the letter, Stansbury met with Peterson, and recommended to Peterson that GT open an investigation into Joseph.  Doc. 187 at 40:19-41:24; Doc. 182 at 186:24-189:25.  Shortly after this meeting, at 1:00 p.m., Stansbury texted GT's Chief Human Resources Officer Kim Harrington recommending a specific lawyer for the investigation of Joseph, stating: "This is who I have used in the past for a similar situation."  Doc. 182-2 at 57.  Stansbury was referring to an investigation this lawyer had conducted at his former university where the women's basketball coach was asked to resign based on player complaints.  Doc. 182 at 186:24-188:22.  Stansbury testified that he probably talked to Harrington about who to retain before sending this text.  Doc. 182 at 191:3-25.

When asked why there was a discussion on February 11 by 1:00 p.m. about bringing in an investigator to investigate Joseph, Stansbury testified that it was because of the letter regarding Pan and an HR complaint lodged by two WBB staff members – Felicia Tucker and Brittany Oliver.  Doc. 182 at 189:1-9, 190:4-191:25, 198:12-24, 202:15-21.  However, Tucker and Oliver did not file their HR complaints until 1:15 p.m. on February 11, after Stansbury had recommended investigating

17

Joseph. Doc. 220-35. When Stansbury recommended the investigator to Harrington, he did not know the specific nature of Tucker's and Oliver's HR complaint. Doc. 182 at 186:24-190:22, 198:22-199:3.

In the days immediately after the filing of Joseph's February 8 complaint, conversations ensued among leadership about how to get Joseph to resign her employment. Doc. 181 at 111:3-112:14. Durham participated in these discussions. Doc. 181 at 19:25-20:8, 23:15-21, 28:1-25, 30:2-31:8, 111:3-112:14, 119:19-120:2, 158:3-159:22, 173:25-176:5. On February 13, Durham texted Oliver-Staley that she thought Stansbury wanted to "use" the WBB letters[3] to "negotiate" Joseph's departure. Doc. 181-3 at 6-7. On February 19, 2019, Joseph met with HR Business Partner Kevin Cruse and complained of further retaliation; during the meeting, Cruse asked Joseph why Athletic Department leadership, including Stansbury, thought Joseph was going to sue or words to that effect. Doc. 218: 165:22-166:2, 166:25-168:9.

Stansbury's hasty decision to investigate Joseph within an hour of receiving an anonymous and vague letter about a student's unhappiness contrasts sharply with his treatment of Pastner a year earlier. Specifically, on December 6, 2017, Pastner, through his attorney, informed GT that he had been accused of sexual assault. Doc.

---

[3] Stansbury received a letter from the parent of a second WBB player, Kierra Fletcher, on February 12, 2019, the day after he decided to investigate Joseph. Doc. 182-2 at 34-35; Doc. 182 at 203:6-205:25.

211 at 156:9-157:2.  After learning of the allegations, Stansbury spoke with Pastner about it, *id.,* and it was not until February 14, 2018, more than two months after the allegations against Pastner first surfaced, that an outside investigator was retained to investigate.  Doc. 220-64 at 3 ¶ 12; Doc. 211 at 14:7-18.

### G. The Littler Investigation and Report

On February 25, 2019, GT retained Eric Hoffman from Littler Mendelson to investigate the WBB program.  ("the Littler Investigation").  Doc. 186 at 21:25-25:10.  On or around that same day, Stansbury participated in a meeting with Hoffman about his investigation.  *Id.* at 39:4-15.  Hoffman was asked to conduct a comprehensive review of the WBB program.  *Id.* at 21:25-25:10.  No one told Joseph about the allegations or the planned investigation.  Doc. 220-4 at 75-76 ¶ 308-311.  Joseph first learned she was being investigated on February 27 when Stansbury placed her administrative leave pending an investigation into an unspecified matter concerning her "behavior."  *Id.*  No further details were provided.  *Id.*

Stansbury selected former WBB sport administrator, Joeleen Akin, whom he knew had a strained relationship with Joseph and who Joseph had identified as a retaliating official in her February 8 complaint, to be the point person in the Littler Investigation to interact directly with the student athletes, Hoffman, and GT administrators.  Doc. 183 at 157:13-25, 207:13-209:8, 241:3-244:20.

Stansbury communicated with Akin regularly throughout the Littler Investigation. Doc. 183 at 238:12-18, 243:11-244:20; Doc. 220-63. Akin identified who Hoffman should interview. Doc. 183 at 202:13-205:3; Doc. 220-49. She did not make any effort to connect Hoffman with former players who Theresa Wenzel, Joseph's former supervisor of almost a decade, had identified as having positive things to say about Joseph. Doc. 183 at 222:20-225:8. Akin solicited negative information about Joseph, Doc. 183-25, and made statements to at least one WBB player that gave the impression that she was biased against Joseph. Doc. 220-57.

On March 11, 2019, Hoffman completed his interviews of current and former players, some of the parents,[4] Tucker, and Oliver, but had not yet interviewed Joseph or her assistant coaches. Doc. 220-39. Nevertheless, on that day Hoffman met with Peterson, Durham, and Oliver-Staley to report his initial findings. Doc. 181 at 158:3-159:18; Doc. 220-40; Doc. 220-13 at 28. Directly after, Durham texted Akin, Stansbury's point person with whom she regularly communicated about the investigation: "Good meeting. We will have all we need," by which she admitted that she meant they had all the information they needed to take disciplinary action against Joseph. Doc. 181-8 at 8; Doc. 181 at 240:16-241:14; Doc. 183 at 241:3-244:20. On March 12, 2019, Hoffman interviewed Joseph and asked her broad

---

[4]Hoffman did not interview either of Pan's parents, one of whom had purportedly written the letter that was the genesis of the investigation. Doc. 263-5

questions about her coaching practices and how she ran her program but did not provide her an opportunity to respond to any specific allegations of alleged misconduct. Doc. 220-4 at 76 ¶ 312-313.

On March 15, 2019, Hoffman provided Durham and Oliver-Staley a draft interim report of his findings. Doc. 263-3. Durham then texted Oliver-Staley: "I hope the final report has more details. This is not as compelling as I had hoped." Doc. 181-3 at 15. Durham testified that she wanted more specific information so that "we could have a clear-cut case for terminating [Joseph]." Doc. 181 at 160:4-161:7, 164:19-165:9.

On March 20, 2019, Hoffman sent his final report ("the Litter Report") to GT officials, and Stansbury, Durham, Oliver-Staley, and Peterson met to discuss it. Doc. 182-28; Doc. 181-17 at 28. That day, Stansbury and Durham discussed writing Joseph's termination letter, Doc. 220-43, and Stansbury sent the Littler Report to Joseph and provided her with three business days to respond. Doc. 187-26 at 2. On March 25, 2019, Joseph submitted a 13-page response to Stansbury. Doc. 263-4. It included hundreds of text messages between Joseph and WBB players. *Id.* On March 26, 2019, at 12:00 p.m., Stansbury terminated Joseph's employment. Docs. 220-46, 220-47.

The Littler Report concluded that Joseph had engaged in conduct that went beyond the scope of acceptable coaching by using profanity, making personal

criticisms of student-athletes, demeaning and disrespecting players, and calling players vulgar names. Doc. 182-28. Although based on interviews with many witnesses, the Littler Report did not identify any names of those making allegations, any context for the allegations, or any dates of the alleged acts of misconduct. It was filled with broad accusations about Joseph's alleged language and coaching behavior. *Id.*

Stansbury testified that context is important in assessing a complaint in the athletics context and testified that whether a coach's conduct is acceptable coaching or not depends on the context in which it occurred. Doc. 182 at 23:9-21, 62:12-63:3, 258:1-15, 275:15-276:2-25, 279:18-280:5. Stansbury, however, acknowledged that there is no context provided in the examples in the Littler Report of the allegations of mistreatment, and importantly, he could not tell whether any of Joseph's alleged actions were warranted or appropriate. *Id.*

Stansbury acknowledged that he was unable to identify who made the allegations detailed in the Littler Report, or how many people actually made such allegations. Doc. 182 at 242:4-247:1, 259:23-263:6, 278:7-19. He acknowledged he was unable to tell whether some of the complaints came from many people or the same one or two people over and over. *Id.* at 260:10-261:23, 264:5-16, 265:23-266:16, 278:7-19.

Stansbury acknowledged that he was unable to tell from the Littler Report whether the players were talking about their own experiences or experiences they had heard from others, or whether some of the concerns complained of were attributable to Joseph's conduct or something else.  *Id.* at 264:17-267:2, 274:25-275:9.  Stansbury acknowledged that he was unable to tell from the Littler Report when Joseph allegedly subjected players to insults or name-calling, how often, what the context was in using the words, and whether the allegations were true.  *Id.* at 275:15-277:17.

Stansbury had 30 years of experience in college athletics and an understanding that Division I athletics is an intense environment.  *Id.* at 21:4-22:7, 24:6-18, 271:15-19, 277:6-13.  He understood that it was not uncommon for Division I coaches to yell on the sidelines or during a game, *id*, and that Joseph, who had been at GT for 18 years, was an intensive and aggressive coach but he had previously said "I hope she'll temper some of the more aggressive antics, but coaching is coaching, and I'm not going to get totally hung up on that."  Doc. 220-29.

Nevertheless, despite the lack of any specific information or context in the Littler Report, Stansbury terminated Joseph's employment, without further discussion with her, the players, or the investigator.  In doing so, he and GT destroyed the reputation and career of a dedicated veteran coach in the most humiliating fashion possible, resulting in significant and permanent harm.

## III.    Standard of Review

This Court reviews *de novo* a district court's grant of a motion to dismiss, *Williams v. Bd. of Regents of the Univ. Sys. of Ga.,* 477 F.3d 1282, 1291 (11th Cir. 2007), and entry of summary judgment, *Jefferson v. Sewon America, Inc.,* 891 F. 3d 911, 919 (11th Cir. 2018).   This Court reviews rulings on the admissibility of evidence for an abuse of discretion.  *Jefferson,* 891 F.3d at 919.

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing Joseph's Title IX employment discrimination claim, and in granting summary judgment on her claims of discrimination in the terms and conditions of her employment prohibited by Title VII, and of retaliatory termination prohibited by Title IX, Title VII, and the GWA.

First, the court erred in holding that Joseph's Title IX claim of discrimination in the terms and conditions of her employment was preempted by Title VII.

Second, the court erred as a matter of law in holding that the manifest disparity in resources provided to Joseph and her team did not constitute discrimination in the terms and conditions of Joseph's employment and that the demonstrable disparities in resources were not attributable to Joseph's sex.

Third, the court erred in holding that Joseph had not presented a triable claim that her termination was motivated by retaliatory animus.  A reasonable jury could find Stansbury's reason for terminating Joseph was a pretext for retaliation based on evidence

that he made the decision before any investigation began and used the investigation to support that predetermined result. Critically, in assessing this evidence the court erred in excluding probative evidence of the timing of the decision. Additionally, a jury could find that the investigation was not independent, and that Stansbury did not honestly believe the conclusions in the Littler Report. The evidence would also permit a jury to conclude that the real reason Stansbury decided to fire Joseph was in retaliation for her protected opposition to sex discrimination in the allocation of resources to do her job.

## ARGUMENT

### I. The court erred in holding that Title VII preempts Joseph's Title IX employment discrimination claims.

Joseph's claim of discrimination in the terms and conditions of her employment is viable under both Title IX and Title VII. The district court adopted the reasoning of the Fifth Circuit in concluding that Title VII provides the exclusive remedy for employment discrimination by federally funded institutions, Doc. 64 at 13, citing *Lakoski v. James*, 66 F.3d 751, 764 (5th Cir. 1995), but that outdated rationale cannot be squared with the Supreme Court's holdings on the scope of Title IX. The Court unequivocally held in 1982 that Title IX encompasses claims of employment discrimination and that a woman who works in a federally funded education program can bring such a claim "if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512,

25

521 (1982).  The Court subsequently held that an employee complaining of such discrimination can bring a private claim for damages.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 172-73 (2005).

In this case, the district court erroneously concluded that *Jackson* applies only to retaliation claims, but there is no support for that conclusion in the Supreme Court's reasoning.  *Jackson* involved a retaliation claim, but the Court held that "retaliation" is a "form of intentional sex discrimination encompassed by Title IX's private cause of action."  *Id.* at 173.  The majority of appellate courts have likewise concluded that employees can bring employment discrimination claims under Title IX.  *See Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 560 (3d Cir. 2017); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017); *Ivan v. Kent State Univ.*, No. 94-4090, 92 F.3d 1185 (table), 1996 WL 422496, at *2 n.10 (6th Cir. July 26, 1996) (per curiam) (unpublished); *Preston v. Virginia ex rel. New Review Cmty. Coll.*, 31 F.3d 203, 205-06 (4th Cir. 1994); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896-97 (1st Cir. 1988).  Courts have reached this conclusion even though the facts underlying the Title VII and Title IX claims overlap.  *See, e.g., Doe*, 850 F.3d 545 at 559-60; *Lipsett,* 864 F. 2d 881 at 896-97.

Despite this clear weight of authority, the district court found the Fifth Circuit's policy rationale in *Lakoski* persuasive, i.e., that allowing a Title IX claim would "disrupt" Title VII's "carefully balanced remedial scheme for redressing

employment discrimination." 66 F.3d at 754; *see also Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857, 862 (7th Cir. 1996) (Title VII preempts a teacher's right to equitable relief under Title IX), *abrogated*, *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246 (2009). *Lakoski* and *Waid* are not persuasive authorities in part because they were decided a decade before the Supreme Court endorsed a private cause of action for employees under Title IX in *Jackson.* More significantly, these courts have substituted a policy rationale about disruption of an administrative scheme for the plain text of the statute evaluated in *Jackson*, and the Supreme Court has repeatedly rejected such policy arguments, stating that Congress is free to pass statutes providing alternate remedies for the same misconduct. *See N. Haven*, 456 U.S. at 535 n.26 (construing Title IX to encompass employment claims and noting that "this Court repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination"); *see also Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 459, 461 (1975) (race discrimination claims actionable under both Title VII and 42 U.S.C. § 1981 because remedies, "although related, and although directed to most of the same ends, are separate, distinct, and independent"); *Alexander v. Gardner Denver*, 415 U.S. 36, 48 (1974) ("the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes").

Importantly, no circuit court since *Jackson* has followed the Fifth and Seventh

Circuits and held that Title VII is the exclusive vehicle for employment discrimination

claims. This Court should remand this case to allow Joseph to pursue her claims based

on the disparate allocation of resources under both Title VII and Title IX.

## II. The court erred in granting summary judgment on Joseph's Title VII claim of discrimination in the terms and conditions of her employment.

### A. The court erred in holding that the obvious disparity in resources did not constitute discrimination in the terms and conditions of Joseph's employment.

Title VII prohibits an employer from discriminating against an individual in

the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).[5]

Joseph raised a triable issue of fact on her disparate allocation of resources claim by

presenting evidence of significant disparities in the resources she was afforded

because of her sex. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).

The district court rejected this claim because it concluded the resource

disparities did not constitute an adverse employment action based on two erroneous

premises. First, the court held that, although it had not previously decided "whether

a funding discrepancy which does not violate Title IX could still constitute an

---

[5]  If this Court agrees that Title VII does not preempt Joseph's terms and conditions claim, she will be able to proceed under Title IX as well, which prohibits a regulated entity from subjecting any person to discrimination. 20 U.S.C. § 1681(a). A Title IX employment discrimination claim is analyzed under the same standards as a Title VII claim. 28 C.F.R. § 42.604; *Preston*, 31 F.3d at 206-207 (collecting cases).

adverse employment action under Title VII," any such claim would require proof of disparities "above and beyond" the disparities affecting the WBB program itself. Doc. 273 at 89. Second, the court concluded that the disparities Joseph identified only "incidentally" impacted her employment conditions. *Id.* These predicate premises were erroneous—the first reflected legal error, the second drew a factual conclusion unsupported by the evidence.

There has been no claim or adjudication of a claim that the funding disparities between the WBB and MBB programs violated Title IX, and it cannot be assumed without evidence and the application of relevant legal authority to the facts that such disparities would not violate Title IX. Certainly, Joseph made no such concession, and instead noted that courts have found Title IX violations based on disparate resources. Doc. 220 at 29, n. 1 (citing *Daniels v. Sch. Bd. of Brevard Cty., Fla.*, 985 F. Supp. 1458, 1460-62 (M.D. Fla. 1997) (plaintiffs likely to succeed on Title IX discrimination claim where defendant provided unequal facilities and marketing to men's baseball and women's softball)).

Even if these significant disparities were found not to violate Title IX in a different case brought by GT students, that would not be preclusive of Joseph's employment discrimination claims under Title VII or Title IX, which are governed by a different standard, namely, whether the discriminatory terms and conditions were serious and material aspects of Joseph's employment. *B&B Hardware, Inc. v.*

29

*Hargis Indus., Inc.*, 575 U.S. 138 (2015) (issue precluded only when the same rule of law applies); *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239-40 (11th Cir. 2001) (adverse action standard), *overruled on other grounds*, *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006).

There is no basis in the governing law for the court's invented requirement that Joseph demonstrate disparities "above and beyond" the ones affecting the WBB program itself.  In coming to this tortured conclusion, the district court misapplied the reasoning of an inapposite decision in *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 798 (S.D. Ohio 1998), *aff'd*, 194 F.3d 1315 (6th Cir. 1999).  The district court correctly noted, as had the *Weaver* court, that "'the facilities and supplies with which a coach is provided are a part of the coach's conditions of employment even though the same factors might be asserted by the students in a Title IX action.'" Doc. 273 at 88 (citing *Weaver*, 71 F. Supp. 2d at 798 (further citation omitted)).

But the court then relied on *Weaver* to support the inapposite point that Joseph could not show adverse terms and conditions of her employment because the plaintiff in *Weaver* had not tied the claimed disparities in resources to performance deficiencies that led to her termination.  Doc. 273 at 89-90.  Here, Joseph has no such burden because that is not the legal theory underlying her claims.  In complaining about resource disparities Joseph engaged in protected conduct which led to her retaliatory termination, as discussed *infra*.  But her discriminatory terms

and conditions claim is a stand-alone claim of discrimination, and she does not have to prove those disparities triggered any other adverse action; rather, the disparities themselves constitute the adverse, actionable discrimination in the terms and conditions of her employment.

All the law requires is that Joseph demonstrate her working conditions were worse than those of the coach of the men's team in a material way, and the evidence is sufficient for a jury to make that determination. *See Davis*, 245 F.3d at 1239-40. The test of material adversity is objective, *i.e.*, whether a reasonable person in an employee's position would find the terms, conditions, or privileges of employment to be adverse. *Id.*

Adverse employment actions include forcing an employee to work under more adverse conditions, to work with inferior resources, or to work under conditions of diminished prestige, any of which would lead a reasonable person in the employee's circumstances to view the action as materially adverse. *See, e.g., N. Haven Bd. of Ed.*, 456 U.S. at 521 (more adverse conditions); *Wedow v. City of Kansas City, Missouri*, 442 F.3d 661, 671 (8th Cir. 2006) (providing female firefighters inferior gear and locker facilities constituted an adverse employment action where it impaired their ability to perform the core functions of their job); *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1452 & n.19 (11th Cir. 1998) (diminished prestige can make a transfer adverse).

In this case, there is no factual foundation for the court's assertion that the disparities of which Joseph complained only incidentally impacted the terms and conditions of her employment. To the contrary, these disparities went to the very heart of Joseph's ability to do her job. As head coach, Joseph was responsible for the operation of the WBB program, which included, among other things, recruiting new players, marketing the program, hiring and managing assistant coaches.

Recruitment was an integral part of Joseph's job. The evidence is undisputed that the quality of a team's locker room affects a coach's ability to recruit players. Further, there is no dispute that the locker room for the women's team was inferior to the locker room provided MBB in virtually all respects, including its accessibility to practice facilities.

There is also no dispute that Defendants provided far fewer resources to market WBB than MBB, including paying for the production of radio and TV shows for MBB, and paying Pastner up to $800,000 annually to appear on these shows, while providing Joseph no such opportunities and no money at all. Even if Joseph were required to demonstrate that the disparities in resources went beyond elements that affected the team and program, the stark difference in the money Joseph received for marketing efforts—zero dollars—compared to the money the men's coach received—$800,000 in 2018—more than meets that test.

32

Assistant coaches are critical to the success of a basketball program and there is no dispute that Joseph received less money to hire them than MBB received and had far less professional office and workspace to offer them. Joseph supplemented her salary pool through fundraising while Pastner did not, which necessarily required that she work harder and longer hours than the MBB coach without additional compensation. Joseph's travel budget for her team was also less than that for MBB and that disparity affected the prestige of her team and her ability to recruit players.

All these resource disparities negatively affected Joseph's ability to perform her core job functions because they made it harder for her to do each element of her job. Given her inferior resources, it was more difficult for her to recruit players, to market WBB, and to attract assistant coaches.

The disparate resources Defendants provided to Joseph also negatively affected the prestige of Joseph's role, which is actionable because lesser prestige is an objectively adverse component of a position for purposes of establishing discrimination in terms and conditions of employment under the applicable reasonable person standard. *See Doe v. Dekalb County*, 145 F.3d at 1452 n.19. As the *Doe* Court explained, "loss of prestige, either within an organization or with regard to the general public, is an objective factor that a court should consider as part of the reasonable person test." *Id.* This lessened prestige can also "affect an employee's marketability, another significant objective factor." *Id.*

33

The effect of such resource disparities is readily understood by considering how a reasonable person would view analogous disparities in the treatment of two hypothetical law firm partners, one male and one female, both of whom were required to generate business. If the firm provided the male partner a posh conference room to host clients but required the female partner to host clients in a windowless basement office, a reasonable person would conclude that this disparate allocation of resources would adversely affect the female partner's ability to do her job. The disparity would signal to clients that she is not as valued or as competent as the male partner, and it could cause potential clients to find another lawyer with better resources. If the law firm provided the male partner more money to market himself, hire qualified staff, and travel than the female partner, this too would make him better suited to generate business and produce better work outcomes.

Drawing all inferences in Joseph's favor, a jury hearing this evidence could conclude that Defendants' disparate allocation of resources in the four program areas described above adversely affected Joseph's ability to perform her core job duties in a serious and material way and thus constituted an adverse employment action.

### B. The court erred in holding these disparities were not based on Joseph's sex.

In addition to concluding that Joseph's claim did not identify disparities in the terms of her employment, the district court also held any such disparities did not

constitute "discrimination on the basis of *her* sex." Doc. 273 at 89 n.39 (emphasis in original).[6] The court erred.

Title VII's prohibition on discrimination, which requires that an individual establish discrimination on the basis of the individual's protected status, extends to employees who are discriminated against because of their association with a member of a protected class or because of their advocacy on behalf of members of a protected class. This Court recognized such claims in the context of race discrimination decades ago. *See Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or *association*, he alleges, by definition, that he has been discriminated against because of *his* race." (first emphasis added)); *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513-14 (6th Cir. 2009) (discrimination impermissible whether based on association with or advocacy for protected employees); *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008) (claim based on interracial association cognizable); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) (Title VII plaintiff need only allege discrimination on the basis of association or friendship with Black co-workers).

---

[6] On remand, if the Court agrees that Joseph's Title IX claim is not precluded by Title VII, she will be able to establish this element of her claim. Title IX prohibits discrimination on the "basis of sex", 20 U.S.C. § 1681(1), and courts agree that associational claims are cognizable under Title IX. *See, e.g., Morris v. Fordham Univ.*, 2004 WL 906248 *3 (S.D. N.Y. 2004) (the prohibition in Title IX is "broad enough to encompass a prohibition of discrimination against plaintiff on the basis of the sex of the players whom he coached").

Courts have extended the rationale of these association cases to all protected classes because the "text of the statute draws no distinction, for this purpose, among the different varieties of discrimination it addresses" and thus "prohibits discrimination on the basis of the national origin, or the color, or the religion, or . . . the sex of the associate." *Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339, 349 (2017); *see also Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 125 (2d Cir. 2018) (holding that "prohibition on associational discrimination applies with equal force to all the classes protected by title VII, including sex"), *aff'd*, *Bostock v. Clayton Cty, Georgia*, 140 S. Ct. 1731 (2020). Considering this overwhelming authority, the district court's observation that a male coach "of a budget-neglected women's sports team could not bring a Title VII claim for sex discrimination" is insupportable. Doc. 273 at 89 n.39.

The district court erred in concluding that the disparate allocation of resources to Joseph and WBB did not constitute discrimination "on the basis" of her sex prohibited by Title VII, and this Court should remand the case for trial on this claim.

### III. The court erred in granting summary judgment on Joseph's retaliatory termination claim on the ground there was no triable issue on pretext.

To survive summary judgment on a retaliation claim, a plaintiff must first show that (1) she engaged in protected activity, (2) she suffered an adverse action,

and (3) a causal connection between the adverse action and protected activity.[7]

*Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1344-45 (11th Cir. 2022).  Once an

employer articulates a legitimate, non-retaliatory reason for the challenged action, a

plaintiff must show that the proffered reason is merely a pretext for retaliation.  *Id.*

### A. Joseph established a prima facie case.

Joseph complained repeatedly about the difference in treatment of WBB

relative to MBB, and of her relative to her male counterparts.  Those complaints,

including her complaints on November 21, 2018, to Peterson, Stansbury and

Rountree and on February 8, 2019, to Rountree, Stansbury, and others, all of which

raised concerns about sex discrimination and retaliation, constitute protected

activity.  Further, the temporal proximity between Joseph's February 8 complaint

and her termination on March 26, combined with the evidence of retaliatory animus

discussed below, readily establishes causation.  *Farley v. Nationwide Mut. Ins. Co.*,

197 F.3d 1322, 1337 (11th Cir. 1999) (seven-week gap between protected activity

and termination sufficient to show causation for prima facie case).

---

[7] This same framework applies to Joseph's claims for retaliatory termination under
Title VII, Title IX, and the Georgia Whistleblower Act.  *Baptiste v. Mann*, 360 Ga.
App. 345, 348 (2021) (applying Title VII framework to GWA retaliation claim);
*Doe v. Gwinnett Cnty. Pub. Schs.*, No. 1:18-cv-05278-SCJ, 2019 WL 12336248, at
* 9 (N.D. Ga. Aug. 22, 2019) (applying Title VII framework to Title IX retaliation
claim).

**B. A reasonable jury could find that Defendants' proffered reason for terminating Joseph was pretextual.**

The district court erroneously held that Joseph failed to rebut Defendants' assertion that Stansbury decided to terminate her because, following receipt of a final report from an independent investigation, he reasonably believed she engaged in inappropriate coaching practices. In so holding, the court improperly ignored key evidence and drew inferences in favor of Defendants.

To show that the employer's reason is pretextual a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Patterson*, 38 F.4th at 1352 (internal citation and quotations omitted). Joseph produced substantial evidence undermining the credibility of BOR's proffered reason for terminating Joseph.

> *1. A reasonable jury could find that Stansbury decided to terminate Joseph before the Littler Investigation started and used the Investigation to support that decision.*

The timing of decisions is often critical to establishing inconsistencies or contradictions that prove pretext and unlawful retaliation. *See Calvert v. Doe*, 648 F. App'x 925, 929-30 (11th Cir. 2016) (vacating summary judgment on retaliation claim where evidence contradicted decisionmaker's testimony about decision timeline); *see also Tsavaris v. Savannah Law Sch., LLC*, 847 F. App'x 634, 642 (11th Cir. 2021) ("If [the decisionmaker] made up his mind to terminate [plaintiff]

38

before observing her teaching, then his observation could not have been the basis for his decision" and would be "strong evidence" that defendant's explanation was a pretext).

Here, Defendants contend that Stansbury decided to terminate Joseph only after reviewing the results of the Littler Investigation. However, the court improperly ignored critical evidence from which a reasonable jury could determine that Stansbury had decided to terminate Joseph *before* the Littler Investigation began. That evidence includes testimony that, on February 4, 2019, when Rountree indicated he might resign because of Joseph's constant complaints, Stansbury texted him not to resign because he was working on "something" with "regards to this" and had a "path forward."

Further, Joseph also proffered evidence that on February 13, before an investigator had been retained, Durham texted Oliver-Staley that she thought that Stansbury wanted to "use" the parent letters he had received to "negotiate" Joseph's departure. When asked about this text message, Durham testified that she based her impression that Stansbury wanted to "negotiate" Joseph's leaving based on the "many conversations happening at that time" about finding "a path" to get Joseph to resign. This evidence directly contradicts Stansbury's assertion that he decided to terminate Joseph only after reviewing the Littler Report and is powerful evidence that the reason proffered for her termination was false.

In addition, evidence that an employer initiated an investigation to build a case for termination is evidence of pretext. *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1186 (11th Cir. 2019) (evidence that an employer was "searching for" a reason to fire plaintiff was probative of discriminatory intent); *see also Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013) (reversing grant of summary judgment where the "initiation and scope" of an investigation were "suspicious" and suggested that the investigation was prompted by the defendants' "desire to construct a case for [plaintiff's] termination").

Here, Joseph presented evidence, which the district court ignored, from which a jury could find that Stansbury, after having decided he wanted to "negotiate" Joseph's leaving, used a player's complaint to launch an investigation so he could justify this predetermined unlawful end. This included evidence that three days after receiving Joseph's complaint of discrimination and retaliation, and within an hour of receiving a vague letter about a player being called negative by staff, Stansbury hastily recommended investigating *Joseph* using a particular lawyer he knew from his prior job who had done an investigation that ended a coach's employment.

The district court gave little weight to this evidence, crediting instead Defendants' claim that students had raised such "serious concerns" that Stansbury had no choice but to investigate Joseph. Doc. 273 at 83, 84. Not only does this

40

conclusion improperly draw inferences in Defendants' favor, but it also ignores competing evidence showing that Stansbury had almost no information about any serious concerns raised by anyone when he recommended investigating Joseph.

Specifically, although Oliver-Staley testified that the WBB players she met with on January 26, 2019, were "scared," the record provides conflicting information about whether or when Stansbury learned this. Stansbury could not recall when Oliver-Staley informed him about the January 26 meeting; he had no specific knowledge of what those players had shared with Oliver-Staley; and neither he nor Oliver-Staley took immediate action in response to whatever the players told her.

A reasonable jury could conclude that had either Oliver-Staley or Stansbury believed the players had raised serious concerns in the January meeting, they would have counseled Joseph about their alleged concerns, or separated her from her student-athletes. Instead, Oliver-Staley went on vacation and Stansbury took no action for weeks. *Cf. Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 692 (7th Cir. 2007) (employer's delay in terminating plaintiff for alleged misconduct undermined the employer's claim that the plaintiff's behavior was "unsafe or severe").

The evidence also demonstrates that Stansbury, rather than knowing about any "serious concerns" of students, had seen just one vague letter complaining that Joseph and her staff called Pan negative and tried to separate her from her best friend,

which he received *less than an hour* before he took the extreme step of recommending GT retain an outside investigator to investigate Joseph.

Further, Stansbury testified that he decided to investigate Joseph not because of tension in the WBB program as the district court concluded, but because of a parent letter and an HR complaint that had been filed by two WBB staff members. However, the record reveals that the HR complaint was not filed until *after* Stansbury recommended investigating Joseph. This contradiction, particularly viewed along with the evidence that Stansbury was discussing a way to get Joseph to resign her employment at this time, raises questions about the veracity of Stansbury's stated reason for wanting to investigate Joseph. *Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (summary judgment improper where a factfinder is needed to weigh credibility).

Critically, although the court acknowledged that one of the reasons tensions were high within the WBB program was that Stansbury was annoyed and "worn down" by Joseph's resource allocation complaints – complaints Joseph had raised again with Stansbury just three days before he decided he wanted to investigate her – the court nevertheless concluded that Stansbury's decision on February 11 to investigate Joseph could not have been motivated by retaliation. This conclusion necessarily required the court to adopt BOR's version of events and draw inferences against Joseph.

Viewing this evidence in the light most favorable to Joseph, a jury could find that Stansbury's desire to end Joseph's employment – not the letter about Pan, and certainly not the not-yet-received HR complaint – was the *real* impetus for the Littler Investigation, and that Stansbury, after receiving the complaint of discrimination and retaliation from Joseph, who had long been a thorn in the side of GT administrators, had had enough.

> 2. *The district court abused its discretion when it refused to consider the Durham timeline evidence.*

In ruling on pretext, the district court failed to consider the Durham evidence Joseph proffered that contradicted Stansbury's testimony and Defendants' decision-making timeline.  A previous ruling by the district court held that "[s]tatements made by non-decisionmakers do not satisfy a plaintiff's burden of showing pretext."  Doc. 203 at 18.  That ruling constituted both an incomplete formulation of the law and a misapplication of it to the facts of this case.  As this Court has consistently held, statements by a non-decisionmaker "'may be both relevant and attributable to the defendant employer if the non-decisionmaker was sufficiently involved in the decision-making process leading up to the adverse employment action.'"  *Calvert*, 648 F. App'x at 928 (citation omitted).

Here, Durham's text message to Oliver-Staley and testimony regarding the "many conversations" about finding a "path" to get Joseph to resign are admissible and highly probative pieces of evidence of the state of mind of key decisionmakers

in the days immediately after Joseph filed her February 8 internal complaint and prior to any investigation. In her role, Durham was intimately involved in every step of the decision to investigate and terminate Joseph.

Among other things, Durham served as the Chief of Staff to President Peterson and the formal liaison between the President and Stansbury, a role in which Stansbury consulted her for advice relating to Joseph's employment; she advised on the decision to terminate Joseph; she was included in conversations about whether GT should investigate and terminate Joseph; and she was one of three people included in a debrief with Hoffman, including receiving an interim report that she complained was "not as compelling as I had hoped."

Cumulatively, this evidence points to the fact that Durham was at the heart of the decision-making process leading up to Joseph's termination, and that accordingly, her statements are attributable to Defendants. *Kidd v. Mando American Corp.*, 731 F.3d 1196, 1210 (11th Cir. 2013) ( if non-decisionmaker was "consulted by [employer's] management" or "otherwise included in the decisionmaking process," his statement could become an admission of the employer); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800-01 (11th Cir. 2005) (statements of a non-decisionmaker are admissible where "the statements reflected some kind of participation in the employment decision or policy of the employer"). The district court's ruling otherwise was an abuse of discretion and must be reversed.

>    *3. A reasonable jury could conclude that the investigation was not independent.*

Evidence that an investigation was not independently or fairly conducted can support a finding of pretext. *See Blackman v. City of Opa Locka*, No. 10-23985-CIV, 2011 WL 13223512, at *3 (S.D. Fla. Nov. 30, 2011) (evidence that an investigation was not independent, including the investigator's failure to meet with key witnesses, precluded summary judgment on racial discrimination and retaliation claim); *see also Laxton v. Gap Inc*., 333 F.3d 572, 582 (5th Cir. 2003) (reversing grant of summary judgment where plaintiff presented evidence that officials "solicited and exaggerated" complaints "to justify a predetermined decision to terminate [her]").

Just as a reasonable jury could find that Stansbury *launched* the Littler Investigation to achieve a certain outcome – i.e., Joseph's termination – so too could a jury find that, once launched, Stansbury *manipulated* the investigation to that same end. Joseph's argument, contrary to what the district court stated, was not that the Littler Investigation was shoddy, but that it was directed by Stansbury to reach this preconceived result.

At the outset of the investigation, Stansbury never told Joseph the allegations against her, preventing her from being able to defend herself. He then hand-picked Akin, who he knew had a tense relationship with Joseph and whom Joseph had just accused of unlawful discrimination and retaliation in her February 8 complaint, to

45

be the point person in the investigation. *See Heaton v. The Weitz Co, Inc*., 534 F.3d 882, 890-91 (8th Cir. 2008) (evidence to support verdict in retaliation case included fact that official selected a "biased" or "perceived partial person" to lead investigations, and investigations were "cursory and indifferent").

Throughout the investigation, Akin was in regular communication with Stansbury and provided him with updates. Akin also worked closely with Durham, the liaison between Peterson and Stansbury who played a central role in the Littler Investigation, and exchanged texts with her that support the inference that Stansbury, through Akin and Durham, was seeking to achieve a certain result. For example, Durham texted Akin after the March 11 debrief with Hoffman, and before Joseph was even interviewed, "Good meeting. We will have all we need," meaning that Defendants would have enough information to take disciplinary action against Joseph. Then, a few days later, when Durham received a draft report from Hoffman, she lamented that the report was "not as compelling" as she had hoped.

From this evidence, a jury could infer that Stansbury, Akin, and Durham were working together, and that Stansbury directed, or at least knew about, the biased way Akin and Durham handled the investigation. Specifically, a jury could infer Stansbury directed or knew that Akin identified witnesses for Hoffman to interview who had only negative things to say about Joseph, reached out to at least one witness on her own to collect unfavorable evidence, and solicited negative information from

46

current WBB players, giving at least one player the impression that Akin was biased against Joseph. A jury could also infer that Stansbury was aware that when presented with the opportunity to furnish names to Hoffman of former student-athletes who played for Joseph and might have positive things to say about Joseph, Akin made no effort to connect those former players to Hoffman.

Notably, in response to Joseph's argument that Akin played a key role in the investigation, the court found that Joseph failed to rebut Hoffman's testimony that he, rather than Akin, directed the investigation and selected interviewees. To the contrary, Joseph presented evidence demonstrating that Akin *had* identified the interviewees, but the court inexplicably ignored it.

> ### 4. *A reasonable jury could find that Stansbury did not have an honest belief in the findings of the Littler Report.*

Evidence that a decisionmaker did not hold an honest belief about the reason for his acts can provide "strong evidence that a defendant has acted with discriminatory intent." *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002). Joseph has presented evidence showing that when Stansbury received the Littler Report, he knew it was the product of an investigation he started for the explicit purpose of achieving his goal of terminating Joseph, an investigation he shepherded through Akin and Durham. A jury could conclude that Stansbury could not hold an honest belief about the report's contents because he knew that the investigation was designed to produce a report that would justify Joseph's

termination.  *Cf. Roberts v. Rayonier, Inc*., 135 F. App'x 351, 360 (11th Cir. 2005) (a reasonable juror could infer that the decisionmaker did not hold an honest belief justifying termination based on "the lack of evidence of significant investigation").

The district court improperly drew inferences in favor of BOR in concluding that there was insufficient evidence for a jury to question whether Stansbury honestly, and in good faith, believed the allegations in the Littler Report.  In support of its assertion that Stansbury based his decision to terminate Joseph on the findings in the Littler Report, BOR relied on testimony from Stansbury in which he explained the discussion around the Littler Report and decision to terminate Joseph's employment and said it really "centered around the "environment and the treatment of student-athletes and the fact that this wasn't one or two student-athletes.  This was the entire team basically saying the same thing."  Doc. 182 at 229:15-232:8, 233:2-8.

However, Stansbury admitted that he had no knowledge of precisely how many players responded in any particular way in the report, which contradicts his conclusion that the "entire team" was "saying the same thing."   For example, when asked about the claim that players did not trust Joseph, he agreed that the language of the report did not indicate how many players actually expressed this feeling.  His conflicting statements about the contents of the report would permit a jury to find his reason for terminating Joseph to be pretextual. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1195 (11th Cir. 2004) (shifting reasons given by

decisionmaker allowed jury to find employer's explanation pretextual and to infer that discrimination was the real reason).

In addition, although Defendants argue that Stansbury reasonably believed Joseph engaged in inappropriate coaching practices, Stansbury acknowledged that the determination of whether certain words or actions are appropriate very often depends on the context. He further acknowledged that as to many of the allegations about Joseph, he did not know the context and could not actually determine whether her words or actions were appropriate.

As further evidence that Stansbury did not hold an honest belief that the Littler Report justified Joseph's termination, Stansbury testified that in some instances, he could not tell whether the alleged conduct was attributable to Joseph; that some of the statements in the report contradicted each other; and that it was impossible to tell whether the witnesses described many occasions of alleged misconduct or merely repeated the same concerns they had heard from others.

Moreover, considering Stansbury's experience in Division I athletics, a reasonable jury could also find that – even if the allegations in the report were true – he did not honestly believe that they warranted Joseph's termination. Prior to the Littler Investigation, Stansbury was aware that Joseph was an intense and aggressive coach, but he did not find this coaching style objectionable. As a former Division I

athlete who worked in college athletics for over thirty years, Stansbury knew that cursing and yelling were common in coaching and not necessarily a sign of abuse.

After reviewing the Littler Report, instead of following up with Joseph or the investigator to seek clarity about the anonymous allegations lacking in specifics or context, Stansbury gave Joseph just three business days to submit a response. Joseph submitted her detailed, thirteen-page response on March 25, 2019, which included specific rebuttals to the allegations in the Littler Report, as well as ninety-one pages of exhibits consisting of hundreds of text messages between Joseph and her players demonstrating her involved, caring coaching style, and several statements from former players attesting to their positive experiences with Joseph as a coach. One day after receiving this response, and without asking any follow-up questions, Stansbury terminated Joseph's employment.

A jury viewing all the evidence in a light favorable to Joseph could find Stansbury's explanation that he terminated Joseph because the "entire team" was "basically saying the same thing" or that he truly believed she engaged in inappropriate coaching practices unworthy of credence. Stansbury's equivocal, contradictory testimony regarding the contents of the Littler Report, combined with his decision not to discuss it or Joseph's detailed response with her, is further evidence that Joseph's termination had been a foregone conclusion and that the Littler Report was just a document needed to achieve a predetermined result.

### C. A reasonable jury could infer that retaliation was the real reason for Joseph's termination.

In addition to producing evidence demonstrating that Stansbury's proffered reason for terminating Joseph was pretextual, Joseph also presented evidence from which a reasonably jury could determine that retaliatory animus motivated the decision.

First, the close temporal proximity between Joseph's protected activity and the launch of the Littler Investigation provides compelling evidence that Stansbury terminated Joseph because of her protected activity. *Patterson*, 38 F.4th at 1355 (temporal proximity can be used to show both causation and pretext). Joseph filed her internal complaint of discrimination and retaliation on February 8, 2019. Just three days later, Stansbury and Peterson discussed investigating Joseph, and Stansbury sent a text message recommending an investigator he had previously used that led to the resignation of the WBB coach at his former employer.

Two days after that, on February 13, 2019, Durham texted Oliver-Staley her impression that Stansbury wanted to "negotiate" Joseph's departure and testified that Defendants were having discussions around this time about how to get Joseph to resign. A jury could find that the investigation was viewed as another means to that end. *See Jefferson*, 891 F.3d at 925 (noting that "suspicious timing" of termination, which "closely followed" plaintiff's protected activity, can establish pretext).

Second, Joseph has presented evidence of Stansbury's retaliatory animus against her. Specifically, Stansbury told Joseph in a harsh tone in a July 2018 meeting that maybe other female coaches should be "fired" (or words to that effect) when they complained about Lewis's discriminatory budget allocations to women's teams. Durham, Rountree, and Stansbury also testified that Stansbury was "annoyed," "worn down," or "tired," at various points because of Joseph's complaints about gender inequity. And when Joseph complained about retaliation to Cruse on February 19, 2019, he told her that GT leadership, including Stansbury, thought she might "sue."

Similarly, a reasonable jury could infer that Stansbury's decision to open an investigation into *Joseph* on the heels of *her* complaint of discrimination and retaliation shows that he thought Joseph's complaints were the problem and that the investigation was designed get rid of her. *See Moore v. City of Atlanta, Georgia*, No. 1:20-CV-3380-JPB-JKL, 2022 WL 19517299, at *30 (N.D. Ga. Dec. 19, 2022) (statements by a decisionmaker questioning plaintiff's complaint of discrimination and the delay in addressing plaintiff's complaint could lead a jury to infer that the decisionmaker harbored retaliatory animus toward plaintiff), *report and recommendation adopted*, No. 1:20-CV-3380-JPB-JKL, 2023 WL 2646300 (N.D. Ga. Mar. 27, 2023).

Third, Stansbury's swift decision to investigate Joseph contrasts sharply with his treatment of Pastner, the head MBB coach, providing further evidence from which a reasonable jury could infer retaliatory intent. Peterson and Stansbury spoke out publicly in defense of Pastner while he and the MBB team were under investigation by the NCAA for major infractions and while Pastner had been accused of sexual assault in the press. Notably, Stansbury became aware of the allegation of sexual assault against Pastner on December 6, 2017, yet GT delayed investigating until February 14, 2018. By contrast, Stansbury started the process of launching a wide-ranging investigation into Joseph less than one hour after receiving a vague letter alleging Joseph and her coaches were creating a negative environment (and, coincidentally, just three days after she sent a complaint about discriminatory and retaliatory treatment of her and her team). *Lewis*, 934 F.3d at 1187-88 (denying summary judgment where plaintiff presented evidence of more favorable treatment of comparators, even though not precisely similarly situated to her).

Joseph's evidence of temporal proximity, retaliatory animus, and more favorable treatment of Pastner calls into question whether Stansbury truly fired Joseph because of the Littler Report. It also raises the inference that he decided to terminate her employment prior to receiving the Littler Report and launched the investigation with that outcome in mind.

53

While a jury could find that the decision to investigate Joseph was a legitimate response to the player complaints, it could also conclude that Stansbury's hasty decision to investigate her only days after her February 8 complaint – when he had very little information about the allegations levied against her – was motivated by retaliatory animus, as was his ultimate decision to terminate her. The district court erred when it sided with Defendants on these disputed issues of material fact.

## CONCLUSION

Throughout her career, Joseph was a relentless advocate for gender equity at GT. She has demonstrated that the Defendants discriminated against her in the terms and conditions of her employment and has also set forth evidence that raises numerous disputes of material fact about whether Defendants retaliated against her for her tireless work to advance women's sports. She is entitled to present that narrative to a jury.

Joseph respectfully asks this Court to reverse and remand Joseph's claims for trial.

Respectfully submitted this 14th day of July, 2023.

/s/ *Lisa J. Banks*
Lisa J. Banks
D.C. Bar No. 470948
banks@katzbanks.com
Carolyn L. Wheeler
D.C. Bar No. 1028645
wheeler@katzbanks.com
Colleen E. Coveney
Georgia Bar No. 686460
coveney@katzbanks.com
**Katz Banks Kumin LLP**
11 Dupont Circle, NW
Suite 600
Washington, D.C. 20036
Phone: (202) 299-1140
Fax: (202) 299-1148

Edward D. Buckley
Georgia Bar No. 092750
edbuckley@bbwmlaw.com
J. Kyle Brooks
Georgia Bar. No. 773561
kbrooks@bbwmlaw.com
**Buckley Bala Wilson Mew LLP**
600 Peach Street, NE
Suite 3900
Atlanta, GA 30308
Phone: (404) 781-1100
Fax: (404) 781-1101

*Counsel for Appellant MaChelle Joseph*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations set forth in FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f) and 11th Cir. R. 32-4, this document contains 12,917 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

KATZ BANKS KUMIN LLP

By:    /s/ *Colleen E. Coveney*
       Colleen E. Coveney
       Georgia Bar No. 686460

       *Counsel for Appellant MaChelle Joseph*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, I electronically filed the above **APPELLANT'S BRIEF** with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

> Courtney C. Poole
> Christopher Michael Carr
> Ronald Machen, Jr.
> Danielle Y. Conley
> Tania Faransso
> Christopher Paul Galanek
> Benjamin Yood

I have delivered four paper copies of the above **APPELLANT'S BRIEF** to the Clerk via courier and mailed one paper copy to counsel for Defendants BOR and GTAA via first-class mail, postage prepaid at the below addresses.

BOR:    Courtney C. Poole
        Georgia Department of Law
        Attorney General's Office
        40 Capitol Square SW
        Atlanta, GA 30334

GTAA:   Ronald Machen, Jr.
        Wilmer Cutler Pickering Hale & Dorr, LLP
        2100 Pennsylvania Avenue NW
        Washington, D.C. 20037

KATZ BANKS KUMIN LLP

By:    /s/ *Colleen E. Coveney*
        Colleen E. Coveney
        Georgia Bar No. 686460

        *Counsel for Appellant MaChelle Joseph*