In the

# United States Court of Appeals

For the Eleventh Circuit

---

No. 23-11037

---

MACHELLE JOSEPH,

Plaintiff-Appellant,

*versus*

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,
GEORGIA TECH ATHLETIC ASSOCIATION,

Defendants-Appellees,

GEORGE P. PETERSON, et al.,

Defendants.

---

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-00502-VMC

____________________

____________________

No. 23-12475

____________________

THOMAS CROWTHER,

Plaintiff-Appellee,

*versus*

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,

Defendant-Appellant.

____________________

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-04000-VMC

____________________

Before WILLIAM PRYOR, Chief Judge, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, ABUDU, and KIDD, Circuit Judges.

BY THE COURT:

A judge of this Court having requested a poll on whether this appeal should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, the Court sua sponte ORDERS that this appeal will not be reheard en banc.

WILLIAM PRYOR, Chief Judge, joined by LUCK, Circuit Judge, respecting the denial of rehearing en banc:

I agree with the decision not to rehear this appeal en banc and write to explain that our panel opinion faithfully applied Supreme Court precedent. Congress enacted Title IX under the Spending Clause, and that framing all but dictates our resolution of this appeal. Our dissenting colleague chastises the panel opinion for failing to learn from the reversal of our circuit in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005). Rosenbaum Dissent at 1. But our dissenting colleague's criticism flunks her own test. Before *Jackson*, the Supreme Court also reversed this circuit in *Alexander v. Sandoval*, 532 U.S. 275 (2001). There, the Supreme Court told us—in no uncertain terms—that the days of courts engineering "such remedies as are necessary to make effective the congressional purpose expressed by a statute" are over, and "[h]aving sworn off the habit of venturing beyond Congress's intent, we [should] not accept [the] invitation to have one last drink." *Id.* at 287 (citation and internal quotation marks omitted). After *Sandoval*, in the absence of unambiguous congressional intent, we must decline to imply private rights of action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002).

No one disputes that employees of federally funded educational institutions have a private right of action for sex discrimination in employment. Title VII provides an express right of action and an administrative remedial scheme for those employees. 42 U.S.C. § 2000e-5. No one disputes too that the Supreme Court has

recognized an implied right of action for *students* who have suffered sex discrimination in violation of Title IX, *see Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13, 694, 709 (1979); *accord Sandoval*, 532 U.S. at 279–80, and Congress has since ratified that reading, *see* 42 U.S.C. § 2000d-7. And, in *Jackson*, the Supreme Court interpreted Title IX to create a related implied right of action for retaliation when employees complain about sex discrimination against *students*. 544 U.S. at 171–74. But Title IX *does not* provide a duplicative implied private right of action for sex discrimination *against employees*.

In *Sandoval*, the Court cautioned that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." 532 U.S. at 286. Without the requisite intent, "a cause of action does not exist and courts may not create one." *Id.* at 286–87. In the Spending Clause context, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 290. "Sometimes," the Court concluded, "th[at] suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would-be plaintiff 'a member of the class for whose benefit the statute was enacted') suggest the contrary." *Id.* (citations omitted). Where Congress's chosen remedy belies intent to create a secondary, implied right of action, "federal tribunals" have no license to "[r]ais[e] up causes of action." *See id.* at 287 (citation and internal quotation marks omitted).

Since *Sandoval*, the Court has reiterated its warning. *Gonzaga University v. Doe*, for example, "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action." 536 U.S. at 283. "[U]nless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement." *Id.* at 280 (citation and internal quotation marks omitted). So, without an "unambiguous" congressional mandate, we have no basis for implying rights of action.

For Spending Clause legislation, "'the typical remedy for . . . noncompliance with federally imposed conditions is not a private cause of action . . . but rather action by the Federal Government to terminate funds.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)). "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the recipients agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022) (alteration adopted) (quoting *Pennhurst*, 451 U.S. at 16, 17). Spending Clause legislation works like a contract: in exchange for federal dollars, prospective recipients accept certain duties and consequences for noncompliance—namely, the revocation of those funds. *See id.* So even where Spending Clause legislation is phrased in terms of the "persons" protected, the inclusion of a funding-based remedial scheme cautions against construing the statute to create other, *implied* remedies. *See Gonzaga Univ.*, 536 U.S. at 284, 289–90 (noting that the conclusion that a Spending

Clause statute did not confer enforceable rights was "buttressed by the mechanism that Congress chose to provide for enforcing [the statute's] provisions").

Title VII and Title IX work together to attack the problem of sex discrimination in schools through *different* mechanisms. As the panel opinion explained, Congress passed Title IX in June 1972 as part of a series of amendments to the Civil Rights Act of 1964 and other antidiscrimination statutes. The Equal Employment Opportunity Act of 1972 first eliminated the educational-institution exception in Title VII's prohibition of employment discrimination, creating an express right of action for school employees. Pub. L. No. 92-261, § 2–3, 86 Stat. 103, 103–04 (Mar. 24, 1972). Just three months later, Congress enacted Title IX to create a separate Spending Clause remedy for sex discrimination in educational institutions. *See* Education Amendments of 1972, Pub. L. No. 92-318, § 901, 86 Stat. 235, 373 (June 23, 1972).

Title IX does not impliedly create a duplicative right of action for employees. It creates an alternative remedy by conditioning federal funding on compliance with its prohibition of sex discrimination in schools. But the dissent would have us believe that Congress—without ever saying as much—fashioned not just an "overlapping" or alternative remedy for employment discrimination in schools, but one nearly identical to Title VII. Rosenbaum Dissent at 11, 19–20 (citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 n.26 (1982)).

It would be odd for our Court to conclude that, over the course of only three months, Congress designed two rights of action for employment discrimination, the first of which expressly requires employees of educational institutions to exhaust administrative procedures with short deadlines while the other allows those same employees to bypass those requirements and proceed directly to federal court. That conclusion would be odder still when you consider that we would have to assume that Congress supposedly created the second right without ever saying so. *Cf. Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995) (finding that Title VII precludes Title IX as to individuals seeking money damages). And, importantly, asking whether duplicative remedies exist for employees of educational institutions is different from asking whether students have *any* private right of action. *See Cannon*, 441 U.S. at 693–94, 709 (holding that a prospective student has a private right of action for sex discrimination in admissions). Students have no federal remedy for sex discrimination besides Title IX. That statutory context matters.

In short, the 1972 amendments created a comprehensive scheme to combat sex discrimination in schools. Title VII operates at the individual level. *See* 42 U.S.C. § 2000e-5(f)(1). Title IX largely operates at the program level. *See* 20 U.S.C. §§ 1681–1682. Title VII creates express private remedies. *See* 42 U.S.C. § 2000e-5(g). Title IX creates express funding remedies. *See* 20 U.S.C. § 1682. *Cannon v. University of Chicago* held that Congress also clearly implied a private right of action under Title IX for students who would otherwise have no remedy for sex discrimination. 441 U.S. at 709. And

*Jackson* held that a teacher could sue under Title IX for retaliation because he complained about sex discrimination against students, a remedy too that would otherwise be unavailable under Title VII. 544 U.S. at 173–74. These rights and remedies cover each "person" Congress intended to protect from sex discrimination in schools through a multi-faceted, multi-*remedy* system.

Our dissenting colleague suggests that our panel opinion undermines the "overlapping" remedies for sex discrimination that Congress designed. Rosenbaum Dissent at 11, 19–20. But that conclusion follows only if we accept her reading of Supreme Court precedents. Our Court has rejected that reading for all the reasons explained in the unanimous panel opinion.

ROSENBAUM, Circuit Judge, joined by JILL PRYOR, ABUDU, and KIDD, Circuit Judges, and by JORDAN, Circuit Judge, as to Parts I and III, dissenting from the denial of rehearing en banc:

Twenty-three years ago, in *Jackson v. Birmingham Board of Education*, we held that a public-school teacher could not sue his employer under Title IX of the Education Amendments of 1972 for gender-based discrimination he faced. *See* 309 F.3d 1333 (11th Cir. 2002), *rev'd & remanded*, 544 U.S. 167 (2005). The Supreme Court reversed. And it emphasized that it had "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183.

Yet today we repeat our mistake from twenty-three years ago. We decline to correct our panel's recent holding that no public-school teacher can sue under Title IX for gender-based discrimination she faced. *See Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855 (11th Cir. 2024). Our decision shows that when it comes to Title IX, we need some more education.

We are an inferior federal court. And Article III of the Constitution binds us to adhere to all the decisions of the "one supreme Court"—even if we don't always agree with them. *See* U.S. CONST. art. III; *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring) (reiterating respect for the Supreme Court's precedents "is absolute, as it must be in a hierarchical system with 'one supreme Court'"). As the Court has explained, and we have acknowledged, "[u]nless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be

followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Litman v. Mass. Mut. Life Ins.*, 825 F.2d 1506, 1509 (11th Cir. 1987) (en banc) (quoting *Hutto v. Davis*, 454 U.S. 370, 375 (1982)).

But today we shirk our obligation. It's telling that in the two decades since *Jackson*, every one of our sister circuits that has considered whether a teacher may sue under Title IX has found they may—the opposite conclusion of our Court. *See Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 560 (3d Cir. 2017); *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106 (2d Cir. 2022); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316–17 (10th Cir. 2017); *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1023 (9th Cir. 2018); *see also Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 707–08 (6th Cir. 2022) (recognizing an employee may sue under Title IX when evaluating the suit of a non-student, non-employee plaintiff).

Chief Judge William Pryor's Statement Respecting Denial tries to excuse the *Joseph* panel opinion's failure to comply with controlling Supreme Court precedent by invoking a different case where the Supreme Court reversed us: *Alexander v. Sandoval*, 532 U.S. 275 (2001). But *Jackson*, decided four years after *Sandoval*, explains why *Sandoval* does not permit limiting the class of plaintiffs Congress gave access to Title IX's cause of action. And two earlier cases that led to *Jackson*—*Cannon v. University of Chicago*, 441 U.S. 677 (1979), and *North Haven Board of Education v. Bell*, 456 U.S. 512 (1982)—also preclude the William Pryor Opinion's reading of

*Sandoval* and its progeny to remove employees' implied private cause of action under Title IX.

As the body of this dissental explains in detail, *Cannon* and *Jackson* reason that anyone who falls into the category of "person[s]" covered under Title IX necessarily enjoys an implied private cause of action under the statute. And *Bell* and *Jackson* show that educational employees are "person[s]" under Title IX. Those three cases give us the answer key here: employees can sue under Title IX.

To be sure, as the William Pryor Opinion notes, Title IX includes an enforcement mechanism that allows the cutting off of federal funds for educational entities that discriminate. But the funding-restriction mechanism kicks in regardless of whether the entity discriminates (or retaliates) against students or employees. And even the William Pryor Opinion concedes that students enjoy an implied private cause of action under Title IX *despite the federal-funds remedy*. Students have this implied private cause of action, the Court has explained, because they are "person[s]" within the meaning of Title IX—just as the Court has found that employees are. And no text or structural aspects of Title IX distinguish between the applicability of the "person[s]" language to students versus employees.

With no apparent answer to this problem, the *Joseph* panel opinion and the William Pryor Opinion pivot and note that Title VII and Title IX provide some overlap in remedies. But contrary to the panel opinion's description, the Court has explained that the

legislative history of Title IX shows that Congress intended the law's full force to apply against employment discrimination. *See Bell*, 456 U.S. at 527–28. Not only that, but in 1986, four years after *Bell* recognized Title IX prohibits employment discrimination, Congress passed legislation that "'ratified *Cannon*'s holding' that 'private individuals may sue to enforce'" Title IX and that placed the existence of such a private right of action "beyond dispute." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) (first quoting *Sandoval*, 532 U.S. at 280; and then quoting *Barnes v. Gorman*, 536 U.S. 181, 185 (2002)).

And on top of that, the Court "repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination." *See Bell*, 456 U.S. at 535 n.26. So an overlap in remedies does not provide a basis for ignoring Congress's policy determination and depriving employees of access to Title IX suits.

In short, the Supreme Court has schooled us that educational employees enjoy an implied private cause of action under Title IX. We have just failed to learn the lesson. And the William Pryor Opinion doesn't earn us any extra credit.

The panel's holding also comes with real-world consequences. Our decision makes ending sex discrimination in our schools harder. Although some teachers may secure relief under Title VII, that statute has procedural differences from Title IX—including a significantly shorter statute of limitations—that make filing claims more burdensome. This matters for teachers

especially, who are overworked and underpaid already, particularly during the schoolyear. Title IX's filing deadlines are much more accommodating and consistent with teachers' workloads than are Title VII's.

Title IX also allows for the recovery of *uncapped* compensatory damages. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) (holding a damages remedy is available under Title IX). By contrast, Title VII has tight limits on any compensatory damages available. *See* 42 U.S.C. § 1981a(b)(3). So by forcing teachers to litigate under Title VII, we deprive them of relief that Congress created for them.

Worse still, the panel did not limit its holding that a teacher cannot sue for discrimination under Title IX to claims cognizable under Title VII. That is, the panel didn't rely on a theory that Title IX precludes only overlapping claims. But "Title VII . . . is a vastly different statute from Title IX . . . ." *Jackson*, 544 U.S. at 175. So to the extent that in the future, we find substantive daylight between the two independent statutes, some teachers who face discrimination might find themselves completely remediless.

I discuss my concerns in more detail in the following sections. Part I shows how the *Joseph* panel's decision violates Supreme Court precedent. Part II reflects on the legislative developments after the Supreme Court issued its binding precedent, which confirm Congress's intent that Title IX provides an implied private cause of action for educational employees. Part III reviews the decisions of all five of our sister Circuits that, since *Jackson*, have

considered whether Title IX offers a private right of action for educational employees. It shows that they unanimously have concluded it does—leaving us as the sole outlier. And Part IV explains why this case presents a question of "exceptional importance" that warrants en banc review. For all these reasons, I respectfully dissent from today's denial of rehearing en banc.

## I. The panel's decision contradicts a long line of Supreme Court precedent.

Section 901(a) of Title IX unambiguously prohibits sex-based discrimination against any "person" in "any education program or activity" that receives federal monies. It provides,

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

Education Amendments of 1972, Pub. L. No. 92-318, § 901, 86 Stat. 235, 373 (1972) (codified as amended at 20 U.S.C. § 1681). Congress enacted the statute under the Spending Clause, which gives Congress the authority to provide federal funds with conditions. *See Joseph*, 121 F.4th at 865.

Title IX has two enforcement mechanisms: the federal government may terminate funds if discrimination occurs, or victims may sue in court under Title IX's Supreme Court-recognized implied cause of action (or both). *See Cannon*, 441 U.S. at 704–08

(discussing how the two enforcement mechanisms work together to accomplish Title IX's goals).

But the panel opinion holds that Title IX "does not create an implied right of action for sex discrimination in employment." *Joseph*, 121 F.4th at 869. That is, the panel opinion says employees can't bring suit under Title IX for discrimination they face. According to the panel, "[n]one of the[] Supreme Court precedents—*Cannon*, *Jackson*, or *Bell*—speak to" that issue. *Id.* at 867. After dispatching the governing precedent, the panel opinion relies largely on broader Spending Clause and implied-right-of-action cases like *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), *Alexander v. Sandoval*, 532 U.S. 275 (2001), *Gonzaga University v. Doe*, 536 U.S. 273 (2002), and *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), to conclude that Title IX contains no implied cause of action for employees. *See generally Joseph*, 121 F.4th at 864–69.

The panel opinion is wrong. And none of the authorities it relies on support its holding. In fact, Supreme Court precedent belies the panel's assertion that Title IX contains no implied cause of action against sex-based discrimination in education employment.

This section walks through each of the cases I mention above, beginning with a discussion of how *Joseph* departs from *Cannon*, *Bell*, and *Jackson*. It then explains why *Pennhurst*, *Sandoval*, *Gonzaga*, and *Gebser* cannot justify the panel's methods. Ultimately, this section shows that the *Joseph* panel opinion clashes with the Supreme Court's decisions.

### A. *The panel disregards* **Cannon, Bell,** *and* **Jackson.**

I begin with *Cannon*. There, the Supreme Court determined that Title IX contains an implied cause of action for private victims of discrimination that Title IX prohibits. *Cannon*, 441 U.S. at 709.

In concluding Title IX has an implied cause of action, the Court considered four factors. *Id.* at 688–709. First, it observed that "Title IX explicitly confers a benefit on persons discriminated against on the basis of sex," and the petitioner there—a medical-school applicant—was "clearly a member of that class for whose special benefit the statute was enacted." *Id.* at 694.

Second, the Court found that "the history of Title IX rather plainly indicates that Congress intended to create [an implied cause of action]." *Id.* It highlighted that "Title IX was patterned after Title VI of the Civil Rights Act of 1964" and "[i]n 1972 when Title IX was enacted, the critical language in Title VI had already been construed as creating a private remedy." *Id.* at 694, 696 (footnote omitted). And the Court concluded that the legislative history showed Congress was aware of that fact. *Id.* at 699–701.

Third, the Court explained that "[t]he award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with—and in some cases even necessary to—the orderly enforcement of [Title IX]." *Id.* at 705–06. Indeed, the Court explained, Title IX has two main purposes: "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Id.* at 704. But "the termination of

federal financial support for institutions . . . . is . . . severe and often may not accomplish the second purpose if merely an isolated violation has occurred." *Id.* at 704–05 (footnote omitted). And "it makes little sense to impose on an individual . . . the burden of demonstrating that an institution's practices are so pervasively discriminatory that a complete cut-off of federal funding is appropriate." *Id.* at 705.

And fourth, the Court rejected the notion that "implying a federal remedy [under Title IX] is inappropriate because the subject matter involves an area basically of concern to the States." *Id.* at 708. Rather, the Court noted, "a prohibition against invidious discrimination of any sort, including that on the basis of sex[,]" is within the federal government's wheelhouse. *See id.*

Three years after it issued *Cannon*, in *Bell*, as relevant here, the Court held that "Title IX proscribes *employment discrimination* in federally funded education programs." *Bell*, 456 U.S. at 535–36 (emphasis added). *Bell* involved two public-school boards that faced complaints by school employees. One employee—a tenured teacher—complained that the school board had violated Title IX by refusing to rehire her after her one-year maternity leave. *Id.* at 517. The other—a school guidance counselor—complained that the board had discriminated against her because of her gender with respect to job assignments, working conditions, and the failure to renew her contract. *Id.* at 518. When the then-existing Department of Health, Education, and Welfare investigated the boards for failure to comply with regulations against employment discrimination

that the Department issued under Title IX, the boards challenged the Department's authority to issue those regulations. *See id.* at 514–19. But before determining whether the regulations exceeded the Department's authority, the Supreme Court first had to consider whether Title IX's reference to "persons" included educational employees in the first place. The Court concluded it did. The Court arrived at this decision for several reasons.

First, "of course," the Court began with the text of Title IX. *See id.* at 520. As the Court explained, Title IX's "broad directive that 'no *person*' may be discriminated against on the basis of gender appears, on its face, to include employees as well as students." *Id.* (emphasis added). Indeed, the Court continued, "Under that provision, employees, *like other 'persons,'* may not be 'excluded from participation in,' 'denied the benefits of,' or 'subjected to discrimination under' education programs receiving federal financial support." *Id.* (emphasis added). And "[e]mployees who directly participate in federal programs or who directly benefit from federal grants, loans, or contracts clearly fall within the first two protective categories described in § 901(a)" of Title IX. *Id.* Not only that, but "a female employee who works in a federally funded education program is 'subjected to discrimination under' that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues." *Id.* at 521.

Based on this reasoning, the Court determined that it "should interpret [Title IX] as covering and protecting [employees]

unless other considerations counsel to the contrary. After all," the Court said, "Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' [in Title IX's text] if it had wished to restrict the scope of [Title IX]." *Id.* (footnote omitted).

That queued up the Court's second consideration: whether anything else in the text suggested that Congress did not intend for Title IX to cover employees. *See id.* at 521–22. The Court rejected any such suggestion. *See id.*

Third, the Court reviewed Title IX's legislative history "for evidence as to whether Congress meant somehow to limit the expansive language of [Title IX]." *Id.* at 522 (footnote omitted). It found none. *See id.* at 523–35. To the contrary, the Court pointed to legislative history that showed Congress intended for Title IX to cover educational employees. *See id.*

Fourth, when the school boards argued that "the victims of employment discrimination have remedies other than those available under Title IX," the Court chided, "These policy considerations were for Congress to weigh, and we are not free to ignore the language and history of Title IX even were we to disagree with the legislative choice." *Id.* at 535 n.26. Not only that, the Court continued, but "even if alternative remedies are available and their existence is relevant," the Supreme Court "repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination." *Id.*

So to sum up these two binding cases, *Cannon* held that Title IX created an implied cause of action for private litigants who were

"persons" to whom Title IX applies. And *Bell* held that educational employees are "persons" to whom Title IX applies. Based on *Cannon* and *Bell* alone, then, the panel opinion, which concludes employees enjoy no implied cause of action under Title IX, is clearly wrong.

Add *Jackson* to *Cannon* and *Bell*, and the panel opinion's error becomes even more confounding. In *Jackson*, a high-school basketball coach complained that the girls' team he coached was not receiving equal resources. *Jackson*, 544 U.S. at 171–72. In response, his supervisors began to give him negative work evaluations and eventually removed him from his coaching position. *Id.* at 172. Jackson sued the school board, alleging that the board violated Title IX by retaliating against him for protesting the discrimination against the girls' basketball team. *Id.* The district court dismissed the coach's case after concluding that Title IX doesn't provide a private right of action for retaliation, and we affirmed. *Id.*

The Supreme Court reversed. *Id.* at 171. It explained that "[r]etaliation against a person because that person has complained of sex discrimination is *another form of intentional sex discrimination encompassed by Title IX's private cause of action*." *Id.* at 173 (emphasis added). And then the Court reversed our Court's judgment against the coach—a school employee—and remanded to allow his sex-based retaliation claim to proceed. *See id.* at 184. So even independently of *Cannon* and *Bell*, *Jackson* stands for the proposition that Title IX provides an implied cause of action for an educational employee discriminated against on the basis of sex.

But together, this trilogy of cases—*Cannon*, *Bell*, and *Jackson*—necessarily demands the conclusion that the panel opinion here is wrong.

Of course, the panel opinion attempts to distinguish and limit *Cannon*, *Bell*, and *Jackson*. But the panel opinion's efforts fail because they are contrary to the Supreme Court's statements and reasoning in and since these cases.

The panel opinion dismissed *Cannon* as irrelevant because it said that *Cannon*'s finding of an implied cause of action under Title IX applies to students only, not employees. *Joseph*, 121 F.4th at 866. And to be sure, *Cannon* involved a Title IX challenge by a prospective student, not an employee. *See Cannon*, 441 U.S. at 680.

But the panel's sidelining of *Cannon* requires us to ignore *Cannon*'s reasoning for *why* Title IX contains an implied cause of action for students. *Cannon* recognized an implied cause of action under Title IX for the student there because it considered (1) the text of Title IX; (2) the legislative history of Title IX; (3) the consistency of an implied cause of action with the rest of Title IX; and (4) the appropriateness of implying a federal cause of action. And based on those things, the Court determined that the statute contained a cause of action for the general category of "persons" under Section 901(a) of Title IX. After all, the text states, "No *person* in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." (emphasis added). Only because the

student was a "person" under Section 901(a), she was "a member of *that* class for whose special benefit the statute was enacted." *Cannon*, 441 U.S. at 694 (emphasis added).

As the Court explained, "There would be far less reason to *infer a private remedy in favor of individual persons* if Congress, instead of drafting Title IX with an *unmistakable focus on the benefited class* [referring to the term "persons" in § 901(a)], had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Id.* at 690–93 (emphases added) (footnote omitted); *see also id.* at 690 n.13 (collecting cases where the Supreme Court has found an implied cause of action when the operable statute referred to individuals, such as "person[s]"). Indeed, the Court observed, "because the right to be free of discrimination is a personal one, a statute conferring such a right will almost have to be phrased in terms of the persons benefited" and thus imply a cause of action for them. *Id.* at 690 n.13 (cleaned up). So necessarily, *Cannon* recognized that *anyone* who qualifies as a "person" within the meaning of Section 901(a) is a part of the "class for whose especial benefit the statute was enacted" and thus enjoys an implied cause of action under Title IX. *Id.* at 688 n.9 (cleaned up).

Granted, standing alone, *Cannon* doesn't tell us whether an employee falls within the category of "person" under Title IX.

But *Bell* does. It says, "Because § 901(a) neither expressly nor impliedly excludes employees from its reach, *we should interpret the*

*provision as covering and protecting these 'persons'* unless other considerations counsel to the contrary." *Bell*, 456 U.S. at 521 (emphasis added). The opinion then determines that no "other considerations counsel to the contrary." *See id.* at 521–40.

Yet the *Joseph* panel opinion brushes off *Bell*. *Joseph*, 121 F.4th at 867. In doing so, it inaccurately characterizes what the Supreme Court did there. The panel opinion asserts that "[t]he Supreme Court . . . held that because '[section] 901(a) neither expressly nor impliedly excludes employees from its reach,' Title IX 'cover[s] and protect[s]' employees through the statute's funding conditions structure." *Id.* (quoting *Bell*, 456 U.S. at 521). That's simply wrong. The Supreme Court limited its holding in *Bell* in no such way. We know this for at least six reasons.

*First*, the Supreme Court's full quotation tells us so. As I've noted, the actual quotation says, "Because § 901(a) neither expressly nor impliedly excludes employees from its reach, *we should interpret the provision as covering and protecting these 'persons'* unless other considerations counsel to the contrary." *Bell*, 456 U.S. at 521 (emphasis added). Nowhere does this quotation or the context in which it appears purport to limit Title IX's inclusion of employees as "person[s]" to Title IX's funding remedies. Rather, as we know from *Cannon*, § 901(a) provides an implied cause of action for anyone who qualifies as a "person" under that section. In fact, as I've noted, *Cannon* expressly tells us that Congress did not limit the remedies of those who qualify as "person[s]" under Section 901(a) to simply "a prohibition against the disbursement of public funds

to educational institutions engaged in discriminatory practices." *Cannon*, 441 U.S. at 690–93 (footnote omitted).

*Second*, nothing at pages 521 or 530 of *Bell*, which *Joseph* pincites as purported authority for its attempt to limit *Bell*'s holding, *see Joseph*, 121 F.4th at 867, in fact supports *Joseph*'s novel interpretation of that case. And there's simply no other statement or reasoning in *Bell* that justifies the panel's limitation. Look as much as you want; it's not there.

*Third*, the panel's effort to limit *Bell*'s holding to protect employees through only the withholding of federal funding is illogical. As I've noted, *Bell* holds that Title IX covers employees because they are "persons" under Section 901(a)'s text. *See Bell*, 456 U.S. at 522 ("Title IX's broad protection of 'person[s]' does extend to employees of educational institutions."); *see also id.* at 520 ("Under [Section 901(a)], employees, like other 'persons,' may not be 'excluded from participation in,' 'denied the benefits of,' or 'subjected to discrimination under' education programs receiving federal financial support."). And *Cannon* tells us Congress enacted Title IX for the benefit of those who fall within the category of "persons" under Section 901(a)'s text, so those "person[s]" enjoy an implied private cause of action.

The *Joseph* panel tries to avoid this inconvenient fact by noting that *Bell* involved challenges to the Department's application of regulations it used to determine whether to withhold federal funding and then stating that "nothing about [Section 901(a)'s] language indicates congressional intent to provide a private right of action to

employees of educational institutions." *See Joseph*, 121 F.4th at 867–68. But the Supreme Court found that the very same text of Section 901(a) that required it to conclude students have an implied private cause of action under Title IX—"No *person* . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" (emphasis added)—also "cover[s] and protect[s]" employees. *Bell*, 456 U.S. at 521. And the panel does not explain how the very same text that "cover[s] and protect[s]" both students and employees somehow limits its coverage of a "person" under Title IX (and thus the availability of an implied cause of action) for employees but not for students.

*Fourth*, as the Supreme Court painstakingly reviews over twelve pages in *Bell*, Title IX's legislative history shows that Congress intended to provide the statute's protections equally to students and employees. *See id.* at 523–35. For instance, the Court relies on the statements of Senator Bayh, the sponsor of the language that Congress ultimately enacted, as "an authoritative guide to the statute's construction." *Id.* at 526–27. And Senator Bayh explained, in speaking about "the scope of the sections that in large part became §§ 901(a) and (b)," "we are dealing with three basically different types of discrimination here. We are dealing with discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, and *discrimination in employment within an institution, as a member of a faculty or whatever. In the area of employment, we permit*

*no exceptions*." *Id.* at 526 (emphasis in original) (internal quotation marks & citation omitted). In other words, the same rules and remedies apply to discrimination in employment in education as apply to discrimination against students in education.

The Court also pointed to an early draft of Title IX to show that Congress intended the law's full force to apply against employment discrimination. *See id.* at 527–28. As the Court explained, Congress based Title IX on Title VI, borrowing near identical language from that statute. *See id.* at 514. But it departed from Title VI in at least one important way: Title VI reaches employment discrimination only when the primary purpose of the federal funds is to support employment, but that is not the case with Title IX. *See id.* at 527–28; 42 U.S.C. § 2000d-3. In fact, the House version of Title IX originally included a parallel limitation, but that limitation was eliminated at conference. *Bell*, 457 U.S. at 527–28. And Senator Bayh highlighted this change: "Title VI . . . specifically excludes *employment* from coverage (except where the primary objective of the federal aid is to provide employment). *There is no similar exemption for employment* in" Title IX. *Id.* at 531 (quoting 118 CONG. REC. 24684, n.1 (1972) (first emphasis in original; second emphasis added)).

The *Joseph* panel opinion ignores *Bell*'s analysis of Title IX's legislative history and substitutes its own half-page abridged version. *See Joseph*, 121 F.4th at 868. That alternative version concludes that "Title IX's enforcement mechanism relied on the carrot and stick of federal funding to combat sex discrimination[,]" even

though the panel opinion acknowledges that Title IX "also provides an implied right of action for students." *Id.* The panel opinion tries to explain the inconsistency in its approach by simply noting that educational employees have a private cause of action for employment discrimination under Title VII and speculating, "It is unlikely that Congress intended Title VII's express private right of action and Title IX's implied right of action to provide overlapping remedies [for educational employees]." *Id.* at 869.

But *Bell* expressly rejects this kind of thinking for two independent reasons. *See Bell*, 456 U.S. at 535 n.26. First, *Bell* explains that "policy considerations [that "the victims of employment discrimination have remedies other than those available under Title IX"] were for Congress to weigh, and we are not free to ignore the language and history of Title IX even were we to disagree with the legislative choice." *Id.* And second, *Bell* notes, "even if alternative remedies are available and their existence is relevant, *but cf. Cannon v. University of Chicago*, 441 U.S., at 711 . . . [("The fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section.")], this Court repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination." *Id.*

In fact, in dissent, Justice Powell tried to advance the same rationale that the *Joseph* panel puts forth. He stressed that "Title VII is a comprehensive antidiscrimination statute with carefully

prescribed procedures for conciliation by the EEOC [Equal Employment Opportunity Commission], federal-court remedies available within certain time limits, and certain specified forms of relief . . . . in sharp contrast to Title IX." *Id*. at 552 (Powell, J., dissenting). But the *Bell* majority rejected his view.

Not only that, but *Jackson* too supports the conclusion that a plaintiff can bring overlapping claims between Title VII and Title IX. Title VII prohibits retaliation against anyone who complains of "an unlawful employment practice" under that statute. 42 U.S.C § 2000e-3(a). Yet *Jackson* determined that an employee who was retaliated against for speaking out against discrimination (that would violate Title VII) in his own job can file a claim directly under Title IX. *See Jackson*, 544 U.S. at 179 ("The complainant is himself a victim of discriminatory retaliation, regardless of whether he was the subject of the original complaint.").[1] So *Jackson* recognized the existence of overlapping claims between Titles VII and IX. After all, the underlying reason the *Jackson* plaintiff could bring his claim was that he was an employee who had experienced discrimination. *See id*. at 173–77. For that reason, the *Joseph* panel opinion's preclusion argument is also contrary to *Jackson*.

*Fifth*, we also know from *Jackson* that *Bell*'s holding didn't limit Title IX's coverage of employees to the remedy of withholding federal funds. *Jackson* wouldn't have found that the coach there

[1] To the extent that the *Joseph* panel opinion dismissed appellant Crowther's retaliation claim based on a contrary reading of *Jackson*, it too should have been revisited. *See Joseph*, 121 F.4th at 870.

enjoyed an implied private cause of action for the retaliation he faced after complaining about sex discrimination if employees enjoyed no implied private cause of action under Title IX.

To be sure, the *Joseph* panel opinion asserts that the *Jackson* coach enjoyed an implied private cause of action only because the sex discrimination he complained of involved students. *Joseph*, 121 F.4th at 866. But that ignores what the Supreme Court said about the facts and the law in *Jackson* (not to mention the line-drawing problems it creates). As the Court explained, the plaintiff coach complained about the girls' team's inadequate funding, equipment, and facilities *because these things "made it difficult for Jackson to do his job as the team's coach."* *Jackson*, 544 U.S. at 171 (emphasis added). In other words, the sex-based discrimination discriminated against the coach in the terms and conditions of *his* employment. So the Supreme Court said that the suit could move forward because Title IX bars "intentional 'discrimination' 'on the basis of sex,'" and "[retaliation] is a form of 'discrimination' because the *complainant* is being subject to differential treatment." *Id.* at 174 (emphasis added). Put another way, the underlying claim recognized in *Jackson* was discrimination against an "employee." And the retaliation claim could move forward only because it fell into that category. *See id.* at 178 ("[R]etaliation falls within the statute's prohibition of intentional discrimination on the basis of sex").

The Court reached this conclusion even though the *Jackson* dissent stressed that "extending the implied cause of action under Title IX to claims of retaliation expands the class of people the

statute protects beyond the specified beneficiaries [of people who had been discriminated against on the basis of sex]." *Id.* at 192 (Thomas, J., dissenting). Indeed, the Court confirmed that "*Title IX's beneficiaries* plainly include *all* those who are subjected to 'discrimination' 'on the basis of sex.'" *Id.* at 179 n.3 (emphases added). In other words, the Court confirmed that, as "person[s]" within the meaning of Section 901(a), employees enjoy an implied private cause of action under Title IX.

But on top of that, in *Gomez-Perez v. Potter*, writing for the Court, Justice Alito said that "*Jackson* did not hold that Title IX prohibits retaliation because the Court concluded as a policy matter that such claims are important. Instead, the holding in *Jackson* was based on an interpretation of the 'text of Title IX.'" 553 U.S. 473, 484 (2008) (quoting *Jackson*, 544 U.S. at 173, 178). At bottom, the Court recognized, the position that "a claim of retaliation is conceptually different from a claim of discrimination . . . . did not prevail" in *Jackson*. *Id.* at 481. Jackson could bring his retaliation claim only because it *was* a permissible employment-discrimination action.[2] But the *Joseph* panel nowhere addressed *Gomez-Perez*'s understanding of *Jackson*.

[2] In fact, no Justice in *Jackson* questioned that employees could bring suits for employment discrimination. Even the dissent was not concerned that an employee was bringing a claim under Title IX; it objected that "Jackson's claim for retaliation is not a claim that his sex played a role in his adverse treatment." *Jackson*, 544 U.S. at 187 (Thomas, J., dissenting). The dissent raised no objections to an employee suing directly under Title IX, under *Cannon*, for

In short, controlling Supreme Court precedent is clear: employees enjoy an implied private cause of action under Title IX. The *Joseph* panel opinion, which reaches the opposite conclusion, defies that binding precedent.

***B. Other Supreme Court precedent does not support the panel's conclusions.***

Perhaps the panel opinion could justify disregarding the Supreme Court's marching orders if the Court gave us contradictory directives. But none of the principal authorities the panel opinion relies on—*Pennhurst*, *Sandoval*, *Gonzaga*, and *Gebser*—can support its holding. *See Joseph*, 121 F.4th at 864–69. I explain why for each.

I start with *Pennhurst*. *Pennhurst* provides the framework for considering when conditions on legislation enacted under the Spending Clause (like Title IX) are permissible. *See* 451 U.S. at 15–27. That case establishes that funding "conditions are binding only if they are clear and 'the recipient voluntarily and knowingly accepts the terms . . . .'" *Joseph*, 121 F.4th at 866 (quoting *Cummings*, 596 U.S. at 219). So, the panel opinion reasons, "we should not recognize" an "implied right of action [that] would impose unclear conditions or remedies . . . ." *Id.* And in the panel opinion's view, allowing employees to sue under Title IX would do just that.

---

discrimination they personally faced. *See id.* (citing *Bell* as an example of a case where "a claimant . . . sought to recover for discrimination because of her own sex").

But once again, *Jackson* (not to mention *Cannon* and *Bell*) precludes the panel's reasoning. It explains that "[f]unding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when [the Court] decided *Cannon*." *Jackson*, 544 U.S. at 182. So, *Jackson* continues, "*Pennhurst* does not preclude private suits for intentional acts that clearly violate Title IX." *Id.* And it's been clear since at least 1982, when the Court issued *Bell*, that employment discrimination (an intentional act by its nature) violates Title IX. *Bell*, 456 U.S. at 520.

The panel opinion also invokes *Sandoval* and *Gonzaga*—each of which the Supreme Court decided a few years *before* it issued *Jackson*. *Sandoval* holds that *Title VI* does not have a private cause of action "to enforce *regulations* promulgated" under that statute. *Sandoval*, 532 U.S. at 293 (emphasis added). In reaching that conclusion, as *Joseph* recognizes, *Sandoval* holds that "statutory intent" to create a private cause of action is necessary to find a private cause of action. *Id.* at 286. "Without it, a cause of action does not exist and courts may not create one . . . ." *Id.* at 286–87.

And *Gonzaga* holds that provisions of the Family Educational Rights and Privacy Act of 1974 are not enforceable in a 42 U.S.C. § 1983 action because they "create no personal rights . . . ."[3] *Gonzaga*, 536 U.S. at 276. To reach that conclusion, the Court had to "first determine whether Congress *intended to create a federal*

[3] Section 1983 allows for suits against state and local officials who violate federal rights. *See* 42 U.S.C. § 1983.

*right*." *Id.* at 283 (emphasis in original). As *Joseph* tells it, *Gonzaga* "rejects the notion that [the Court's] cases permit anything short of an unambiguously conferred right to support a cause of action." *Joseph*, 121 F.4th at 865 (quoting *Gonzaga*, 536 U.S. at 283).

Based on these two pre-*Jackson* decisions, the *Joseph* panel concludes that "[w]here implied rights of action exist, we must honor them, but we cannot expand their scope without assuring ourselves that Congress unambiguously intended a right of action to cover more people or more situations than courts have yet recognized." *Id.* at 865. Then, once again relying on its erroneous conclusion that *Cannon*, *Bell*, and *Jackson* don't recognize a right of action for employment discrimination under Title IX, the panel opinion states that Title IX lacks such an implied private cause of action. *Id.* at 867–69.

We already know that the panel opinion's (mis)reading of *Cannon*, *Bell*, and *Jackson*, in violation of what they hold, is wrong. But on top of that, the panel opinion's ruling also gets *Sandoval* and *Gonzaga* wrong. As it turns out, they also fully support the conclusion that *Cannon* recognizes a broad scope of entitled plaintiffs under Title IX.

*Sandoval* explains that it's "beyond dispute that private individuals may sue to enforce" the statutory right conferred by Title VI (and by extension Title IX, which has identical language). *Sandoval*, 532 U.S. at 280. And it recognizes that the 1986 congressional amendments to Title IX "cannot be read except as a validation of

*Cannon*'s holding." *Id.* So what was once an implied cause of action effectively became an express one.

In fact, like the *Joseph* panel opinion, the defendants in *Jackson* argued *Sandoval* prohibited recognizing employees' retaliation claims under Title IX. But the Court rejected that argument. *Jackson*, 544 U.S. at 178. It explained that employee retaliation claims were "[i]n step with *Sandoval*" so long as they do "not rely on regulations extending Title IX's protection beyond its statutory limits . . . ." *Id.* So employees can bring suits for retaliation because "the statute *itself* contains the necessary prohibition." *Id.* (emphasis in original).

Here, the plaintiff does not rely on regulations as in *Sandoval*. Rather, the plaintiff invokes the statutory text. And under *Bell*, an employee is a "person" under Title IX. So Title IX's implied private right of action extends to employment discrimination in education.

*Gonzaga* offers even less support for *Joseph* than does *Sandoval*. It recognizes that "Title IX of the Education Amendments of 1972 create[s] individual rights because [that] statute[] [is] phrased 'with an *unmistakable focus* on the benefited class,'"—the benefited class consisting of those falling within the meaning of "*person*" under Title IX. *Gonzaga*, 536 U.S. at 284 & n.3 (emphasis in original) (quoting *Cannon*, 441 U.S. at 691). Indeed, the Court explains, unlike with the right-creating language in Title IX, "[w]here a statute *does not* include this sort of explicit 'right- or duty-creating language,' we rarely impute to Congress an intent to create a private

right of action." *Id.* (emphases added) (citations omitted). So the panel opinion cannot justify its conclusion by relying on *Gonzaga*.

The final major authority the *Joseph* panel opinion mistakenly relies on is *Gebser*, which the Court decided seven years before *Jackson*. *See Joseph*, 121 F.4th at 869. *Gebser* holds that a school district may be held liable in damages under Title IX for a teacher's sexual harassment of a student only if "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Gebser*, 524 U.S. at 277.

In reaching that conclusion, the Court explains that "[b]ecause the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Id.* at 284. Then the Court notes that Title IX's express enforcement mechanism—the withdrawal of federal funding—"operates on an assumption of actual notice to officials of the funding recipient." *Id.* at 288. In fact, the Court continues, "an agency may not initiate enforcement proceedings until it 'has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.'" *Id.* (citation omitted). Given that Title IX's express enforcement mechanism requires actual notice and the rough equivalent of deliberate indifference, the Court reasons, Title IX's implied remedy must likewise require these same things. *See id.* at 289–90.

The *Joseph* panel opinion points to language from *Gebser* that says, "To guide the analysis, we generally examine the relevant statute to ensure that we do not fashion the scope of an implied right in a manner at odds with the statutory structure and purpose." *See Joseph*, 121 F.4th at 867 (quoting *Gebser*, 524 U.S. at 284). Based on this language, the *Joseph* panel then independently evaluated the "text of Title IX and its statutory structure," disregarding *Cannon*, *Bell*, and *Jackson*, to conclude Title IX's cause of action doesn't include employment-discrimination claims. *Id.* at 867–69. But *Gebser* holds only that the *scope* of the implied private remedy for "person[s]" under Title IX must comport with the structure and purpose of Title IX. *See Gebser*, 524 U.S. at 284. *Gebser* doesn't in any way purport to give courts license to reevaluate whether an implied right of action for "person[s]" under Title IX exists in the first place. After all, *Cannon*, *Bell*, and *Jackson* already hold that it does.

And the Court has never restricted access to Title IX's cause of action to any subclass of these "person[s]" subject to intentional sex discrimination. In fact, in upholding employee-retaliation actions in *Jackson*, the Court explained that its "cases since *Cannon*, such as *Gebser* . . . , have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183. Put simply, we don't have authority to eliminate employment-discrimination actions "because the statute *itself* contains the necessary prohibition." *Cf. id.* at 178.

So none of the panel opinion's cited authorities support its conclusions. And the panel's holding defies *Cannon*, *Bell*, and *Jackson*.

## II. Legislative developments since *Cannon* and *Bell* further confirm that Congress intended a private cause of action for "person[s]" under Title IX.

Not only does Supreme Court precedent require the conclusion that Title IX contains an implied private right of action for educational employees who experience intentional discrimination, but in the years following *Cannon* and *Bell*, Congress has effectively blessed the Court's conclusions in those cases.

As I've discussed, in 1979, in *Cannon*, the Supreme Court determined that Title IX contains a private implied cause of action for "person[s]" within the meaning of that statute. Three years later, in 1982, the Court issued *Bell*, concluding that employees are "person[s]" under Title IX. Congress has since amended Title IX in ways that have led the Supreme Court "to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX" to relief other than damages. *Franklin*, 503 U.S. at 72.

Through the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. § 2000d-7, "Congress . . . ratified *Cannon*'s holding." *Sandoval*, 532 U.S. at 280. It "expressly abrogated States' sovereign immunity against suits brought in federal court to enforce" Title IX. *Id.*; *see* 42 U.S.C. § 2000d-7. Faced with *Cannon*, Congress

*expanded* the number of actions that could be brought under Title IX. And Congress also provided that "remedies (including remedies both at law and in equity) are available . . . to the same extent as such remedies are available . . . in the suit against any public or private entity other than a State." 42 U.S.C. § 2000d-7(a)(2). So Congress expressly acknowledged that public and private entities could already be sued under Title IX. This statute "cannot be read except as a validation of *Cannon*'s holding." *Sandoval*, 532 U.S. at 280 (quoting *Franklin*, 503 U.S. at 72).

Congress's 1986 amendments of Title IX came four years after the Court's opinion in *Bell* and seven after its decision in *Cannon*. So when Congress chose to expressly acknowledge and expand the cause of action under Title IX, it knew the Court interpreted the statute to prohibit employment discrimination. Indeed, at least one of our sister circuits had already taken it as a given that employees could sue under Title IX. *See O'Connor v. Peru State Coll.*, 781 F.2d 632, 642 n.8 (8th Cir. 1986) ("Claims of discriminatory employment conditions are cognizable under Title IX." (citing *Bell*, 456 U.S. 512)); *see also Thompson v. Bd. of Educ. of Romeo Cmty. Schs.*, 709 F.2d 1200, 1202, 1206 (6th Cir. 1983) (adjudicating the class-action certification and standing of pregnant teachers suing their schools under Title IX). In other words, even if we ignore, on their own terms, the Supreme Court's conclusions in *Cannon* and *Bell* that the 1972 Congress intended an implied private right of action for "person[s]" under Title IX and employees are such "person[s]," in 1986, when Congress amended the statute, it intended such a right of action.

In fact, when Congress passed the 1986 amendments, it "correct[ed] what it considered to be an unacceptable decision" of the Supreme Court. *Franklin*, 503 U.S. at 73 (citing *Grove City Coll. v. Bell*, 465 U.S. 555 (1984)). Yet tellingly, though it did so, Congress neither abrogated the Court's holding in *North Haven Board of Education v. Bell* nor limited the cause of action in *Cannon* to students, as the panel opinion did.

This is especially noteworthy because in the years following Title IX's passage, Congress also refused to pass legislation to remove employment discrimination from Title IX's coverage. *See Bell*, 456 U.S. at 534–35 (noting that Congress took no action on two bills that would have amended Title IX to exclude coverage for employees, one of which Senator Bayh opposed in part on the ground that it "would exempt those areas of traditional discrimination against women that are the reason for the congressional enactment of title IX," including "employment and employment benefits." (citing S. 2146, § 2(1), 94th CONG. 1st Sess. (1975); 121 CONG. REC. 23845–47 (1975); S.2657, 94th CONG. 2d Sess. (1976); 122 CONG. REC. 28136, 28144, 28147 (1976))); *see also, e.g.*, *Franklin*, 503 U.S. at 73 (noting that the Civil Rights Restoration Act of 1987, Pub. L. 100-259, 102 Stat. 28 (1987), did not "in any way alter[] the existing rights of action and the corresponding remedies permissible under Title IX," but rather "broadened the coverage" of Title IX).

In sum, both in the process leading to Title IX's enactment and in the years following the Supreme Court's decisions in *Cannon* and

*Bell*, Congress has shown its intent for Title IX to provide employees with an implied private right of action.

### III. Every other Circuit that, since *Jackson*, has considered whether Title IX provides an implied private cause of action for employees has concluded it does.

Since the Supreme Court issued *Jackson* in 2002, holding that the employee there enjoyed an implied private cause of action under Title IX, every other Circuit that has considered the question—five in all—have (unsurprisingly) likewise held that employees have an implied private cause of action under Title IX. Not only that, but most of our sister Circuits have expressly found that Supreme Court precedent requires that conclusion.

I begin with *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d Cir. 2017). There, the Third Circuit held that "Title VII's concurrent applicability does not bar [the employee plaintiff's] private causes of action for retaliation and *quid pro quo* harassment under Title IX." *Id.* at 560. In reaching this conclusion, the court noted that the Fifth and Seventh Circuits had, before *Jackson* issued, concluded that Title VII precludes employees' access to Title IX's private right of action for employees. *Id.* at 563 (discussing *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995), and *Waid v Merrill Area Pub. Schs.*, 91 F.3d 857 (7th Cir. 1996)). But the court rejected those courts' conclusions, observing that the cases "were decided a decade

before the Supreme Court handed down *Jackson*, which explicitly recognized an employee's private claim under *Cannon*." *Id.*

Similarly, the Second Circuit determined in *Vengalattore v. Cornell University*, 36 F.4th 87 (2d Cir. 2022), that an implied cause of action for employees exists under Title IX. It reviewed *Cannon*, *Bell*, *Franklin*, and *Jackson* and also rejected *Lakoski*, the pre-*Jackson* opinion that found no implied cause of action for employees. *Id.* at 104–06. The Second Circuit said that, "having the benefit of all of the Supreme Court decisions discussed" and "given the Supreme Court's Title IX rulings in *Cannon* and [*Bell*], we must honor the breadth of Title IX's language. We thus hold that Title IX allows a private right of action for a university's intentional gender-based discrimination against a faculty member . . . ." *Id.* at 105–06.

*Hiatt v. Colorado Seminary*, 858 F.3d 1307 (10th Cir. 2017), is no different. There, the Tenth Circuit considered an educational employee's suit against her former employer under, among other laws, Title IX. *See id.* at 1314. The court first cited *Bell* for the proposition that Title IX "includes a prohibition on employment discrimination in federally funded educational programs." *Id.* at 1315. Then the court noted that *Jackson* "interpret[ed] Title IX as creating a private right of action for [a claim of retaliation against a person for complaining of sex discrimination]." *Id.* Without further ado, the court considered whether the employee there had established a prima facie case of discrimination.

As for the Sixth Circuit, it had to determine whether contract employees and visiting students enjoy an implied private right

of action under Title IX in *Snyder-Hill v. Ohio State University*, 48 F.4th 686, 707–09 (6th Cir. 2022). In concluding they do, the court explained, "[W]e have never limited the availability of Title IX claims to employees or students." *Id.* at 707. The court quoted *Bell* and noted that Congress "did not limit" Title IX by "substitut[ing] 'student' or 'beneficiary' for the word 'person,'" so "Title IX's plain language sweeps more broadly." *Id.* (quoting *Bell*, 456 U.S. at 521).

Finally, in *Campbell v. Hawaii Department of Education*, 892 F.3d 1005 (9th Cir. 2018), the Ninth Circuit apparently viewed the notion that Title IX provides for an implied private right of action for employees as so well settled that it simply noted that it "generally evaluate[s] employment discrimination claims brought under [Title IX and Title VII] identically . . . ." *Id.* at 1023. Then the court addressed the merits of the plaintiff employee's Title IX claims for intentional sex discrimination. *See id.* at 1024.

Since the Supreme Court issued *Jackson*, the *Joseph* panel opinion stands alone both in holding that Title IX includes no implied private right of action for employees and that the *Cannon*, *Bell*, and *Jackson* trilogy doesn't require that conclusion.

## IV. This case is one of "exceptional importance" warranting en banc review.

The panel decision also raises a question of "exceptional importance." FED. R. APP. P. 35(a)(2). First, as I've explained, it violates binding Supreme Court precedent. Second, the panel decision usurps congressional policy-making authority. And third, this case concerns the scope of a cause of action at the heart of Congress's

intentions for Title IX, the principal tool for eliminating sex discrimination in our schools. While *Cannon* originally implied a cause of action under Title IX, Congress placed "beyond dispute" the proposition that Title IX is privately enforceable. *See Sandoval*, 532 U.S. at 280. And *Joseph* has undermined Congress's vision for who gets to sue under a piece of critical civil-rights legislation. In doing so, *Joseph* deprives educational employees of a remedy Congress created for them.

As I've noted, the Supreme Court has found that the text and legislative history of Title IX require the conclusion that Congress intended for the law to cover educational employees. Congress's decision to provide employees with a private cause of action under Title IX was a policy judgment for Congress's determination, not ours. Our job is to simply recognize Congress's intent to allow employees to sue directly under Title IX.

It's especially important that the panel's error be corrected because Title IX has significant differences from Title VII, and the loss of the Title IX remedy carries tangible consequences for litigants. Title VII comes with several procedural roadblocks that make claims harder to file than under Title IX. *See Fort Bend Cnty. v. Davis*, 587 U.S. 541, 544–45 (2019) (summarizing Title VII's procedures). Title IX also allows for the recovery of damages that Title VII does not provide for. And we may find substantive differences between Title IX and Title VII's coverage in the future because they are two *independent* statutes.

I begin with the procedural differences. For starters, Title VII requires that employees file a claim with the EEOC *within 180 days*. *See* 42 U.S.C. § 2000e-5(e)(1). Title IX claims don't expire that quickly. Because Title IX contains no express statute of limitations, we have held, consistent with our sister circuits, that the statute of limitations for state personal-injury actions applies to Title IX cases. *M.H.D. v. Westminster Schs.*, 172 F.3d 797, 803 (11th Cir. 1999) (citing *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996)).

In Georgia and Alabama, the relevant limitations period is *two years*. GA. CODE ANN. § 9-3-33; ALA. CODE § 6-2-38(*l*). In Florida, it may be as long as *four years*. FLA. STAT. § 95.11(3)(e) & (o) (providing the statute of limitations for actions "founded on a statutory liability" and "[a]ny action not specifically provided for" by Florida's statutory law.) By forcing litigants to proceed under Title VII, we severely shrink the time they have in which to file their claims.

Title IX's longer filing deadlines are especially important because the class of plaintiffs for this cause of action is teachers. Inundated with assignments to grade, lesson plans, and student emergencies—tasks that teachers can't complete during only school hours—these educators don't have spare time to quickly file EEOC complaints. Plus, we want schoolteachers' focus to be on their students. And teachers themselves may want to wait until term breaks to avoid the disruption to their classrooms that might come from a high-profile complaint. Given the stigma that might result

from filing a complaint, teachers may also need time to develop the courage to come forward. Indeed, the scrutiny of close-knit campus communities can amplify teachers' fears in a way that other work environments generally don't.

The burden on teachers' time is also greater because Title VII forces them to jump through hoops that Title IX doesn't require. For example, Title VII mandates plaintiffs first file a complaint with the EEOC and obtain a right-to-sue letter before filing in federal court. *See* 42 U.S.C. § 2000e-5(f). Before providing the letter, the EEOC conducts an independent investigation of the charges and attempts to reach a conciliation agreement. *Id.* If state or local law is on point, the law directs litigants to file with a state or local agency first. *Id.* § 2000e-5(c). Within 90 days of receiving a right-to-sue letter, Title VII plaintiffs must bring their claims. *Id.* § 2000e-5(f)(1). Litigants under Title IX's cause of action do not have to meet these requirements. And hard-working teachers should not be forced to, either.

On top of the procedural obstacles of Title VII, some teachers can recover more in damages under Title IX. So we refuse them relief that Congress intended by restricting them to Title VII. Title IX allows for the recovery of *uncapped* compensatory damages. *See Franklin*, 503 U.S. at 76. By contrast, Title VII has tight limits on any compensatory damages available. The statute caps damages

by an employer's size for future pecuniary losses, inconvenience, and other nonpecuniary losses. 42 U.S.C. § 1981a(b)(3).[4]

This could be especially limiting for academics who, because of prohibited discrimination, for instance, have been denied grants critical for research that create lucrative or otherwise important opportunities. Several federal courts have recently recognized that plaintiffs proceeding under Title IX and similar Spending Clause statutes may recover damages on a "loss of opportunity" theory. *See Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-614, 2023 WL 424265, at *5 (E.D. Va. Jan. 25, 2023) (finding that under Title IX, "compensatory damages that are not based upon specific monetary harm but stem directly from lost opportunities suffered as a result of discrimination can nonetheless serve as a basis for damages"); *A.T. v. Oley Valley Sch. Dist.*, No. 17-4983, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023) (Title IX "[p]laintiffs' claims for lost income, lost opportunity, fringe benefits, attorney fees, costs and any other non-emotional distress compensatory damages shall remain"); *see also Chaitram v. Penn Medicine-Princeton Med. Ctr.*, No. 21-17583, 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022) (allowing recovery of damages under Section 1557 of the Affordable Care Act and Section 504 of the Rehabilitation Act for loss of opportunity); *Montgomery*

[4] It's true that Title VII allows punitive and emotional damages likely not recoverable under Title IX. See *Barnes*, 536 U.S. at 189; *Cummings*, 596 U.S. at 230. But whether the overall recoverable damages are larger under Title VII or Title IX will vary case by case, so teachers should have access to both their statutory remedies, given that Congress created mechanisms for them to do so.

*v. D.C.*, No. CV 18-1928, 2022 WL 1618741, at *25 (D.D.C. May 23, 2022) (allowing recovery of damages for loss of opportunity under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act). Advancing that theory, these professors could likely recover more under Title IX than under Title VII.

And there's also a meaningful difference in the amount of lost wages that a plaintiff can recover under these statutes. Under Title VII, "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [Equal Employment Opportunity Commission]." 42 U.S.C. § 2000e-5(g)(1). No such cap exists for Title IX. So a long-tenured professor could not recover the same withheld wages that he might be able to get under Title IX.

Finally, it's important to remember that "Title VII . . . is a vastly different statute from Title IX . . . ." *Jackson*, 544 U.S. at 175. So although we typically evaluate Title IX in line with Title VII, we may in the future find substantive daylight between the two independent statutes. Yet the panel opinion does not limit its holding to only claims that can be litigated under Title VII. *See Joseph*, 121 F.4th at 869. And that leaves open the potential for plaintiffs to be completely deprived of a remedy.

Our usurpation of Congress's policy-making function and these tangible consequences for educational employees make this case one of "exceptional importance." And we should have corrected the panel's mistake as an en banc court.

## V. Conclusion

With Title IX, Congress sought to eradicate employment discrimination in our schools. The Supreme Court has recognized this fact. But the panel's decision knee caps a critical tool to address this corrosive force, contradicting both the Supreme Court's precedents and the intent of Congress. As a result, I respectfully dissent from today's decision to deny rehearing en banc.